IN THE

# Supreme Court of Georgia,

## AT ATLANTA.

### MARCH TERM, 1887.

PRESENT—LOGAN E. BLECKLEY, . . . . . CHIEF JUSTICE.
    SAMUEL HALL, . . . . . . . . ASSOCIATE "
    M. H. BLANDFORD, . . . . . . . ASSOCIATE "

BROWN *et al.* *vs.* MATTHEWS *et al.*

1. A charge, torn to pieces and scattered in disjointed fragments, may seem objectionable, although when put together and considered as a whole, it may be perfectly sound. The full charge being in the record, what it lacks when divided is supplied when the parts are all united. United they stand, divided they fall. The charge submits fairly to the jury three questions, to-wit: whether the land in dispute was paid for; whether the altered deed was altered by procurement or with consent of the plaintiff's husband; and whether the trade was ever rescinded. These three questions of fact exhaust the case.

2. To warrant the court in charging the jury on a given topic, such as whether certain land was included in a purchase by certain persons of other land, it is not necessary that the evidence should shine upon it with a clear light. It is enough if glimpses of it be afforded by the evidence. Truth is often dim, but is truth nevertheless. Frequently amongst the facts best proved is one which no witness has mentioned in his testimony, such fact being an inference from other facts.

3. To exclude declarations as communications to counsel, or made with a view to employment, their root in the relation, or contemplated relation, of client and attorney must be manifest. They must be
    v 79-1

the offspring of the relation, present or prospective, not of taking or expecting to take the fruits of such a relation without forming it. To tax a lawyer's courtesy or liberality for advice or services is not to employ him. Generally, the test of employment is the fee.

4. When a relevant fact or act is to be accounted for, a conversation had by one of the litigating parties with a third person in the absence of the other, may account for it or serve as a link in the chain of explanation. If so, it is admissible in evidence. But the application of this rule must be carefully guarded.

5. There was no material evidence admitted illegally, except that which was withdrawn from the jury before the charge of the court was delivered, and the fact of withdrawal plainly implying that it was not to be considered, there was no error in omitting to warn the jury in the general charge not to consider it. In a civil case, if not in all cases, the evil done by suffering the jury to hear illegal evidence is sufficiently corrected, as a general rule, by merely withdrawing the evidence or ruling it out.

6. The newly discovered evidence would not change the verdict, and the verdict is already right.

July 5, 1887.

Charge of Court. Words and Phrases. Evidence. Attorney and Client. Before Judge SIMMONS. Houston Superior Court. October Term, 1886.

To the report contained in the decision, it is necessary to add only the following: The charge of the court, various paragraphs of which formed grounds of the motion for a new trial, was as follows:

" This suit in ejectment is brought by Mrs. Brown, the former wife of W. H. Lowe, for the recovery of the west half of lot of land 116 in your county. She claims that Mr. John F. Lowe and Samuel Lowe have possession of that land, and that they refuse to surrender it to her; and she brings this suit in order to compel them to give her possession of the land, which she claims belongs to her and her children as heirs at law of W. H. Lowe. To that declaration they have filed a plea of the general issue of not guilty, and set up certain explanations which I will speak of presently. It seems that both parties, the plaintiff and defendant, claim, under James Hardison, their title. That being so, it is not necessary for Mrs. Brown to go back farther than the time of the deed from Hardison to her husband; and if you believe from the evidence that she shows title from James Hardison to W. H. Lowe, why she makes out a *prima facie* case. A deed from

Hardison to W. H. Lowe to this lot of land would make out a *prima facie* case, and she would be entitled to recover, unless the defendant shows some reason why that deed has been cancelled, and what the deed was cancelled for, or something of that sort.

"They claim, and they set it up as their defence, that that deed was made by Hardison to W. H. Lowe. They say Samuel Lowe, the father, and W. H. Lowe bought 290 acres of land from Hardison jointly, and that subsequently to that purchase from Hardison, John Lowe bought out his brother, Hal Lowe, and that John Lowe stepped into the shoes of Hal, and that he paid his brother Hal what Hal had agreed to pay Hardison, and therefore, while he had no deed from Hal, yet he paid the purchase money and went into possession; therefore she is not entitled to recover the land.

"They also claim that, when the land was paid for by Samuel and John Lowe, when it was all paid for by these two parties, Hardison gave them a deed jointly, and by some reason or other this half lot was left out of that deed, and upon ascertaining that subsequently, they got W. H. Lowe to go to Hardison and have that put in, and therefore say he is bound for that reason not to sue for this land. Of course if he could not, his wife and children cannot. That is a part of their defence.

"The plaintiff denies this and claims that W. H. Lowe never did any such thing as that, and therefore this deed is void because it was made without the knowledge and consent of W. H. Lowe. So you see, gentlemen of the jury, there is very little law connected with this case; it is more a question of fact for you to determine than anything else.

"Now if the statement of the defendant's counsel and John Lowe is true, then they would have a good case. Therefore if you believe from the testimony that Samuel and W. H. Lowe went together and purchased this land from Hardison, and that after that time, W. H. Lowe sold his interest in that land to his brother John, and John paid W. H. Lowe all the purchase money for the land, and W. H. Lowe recognized it as being paid, then I charge you, you would be authorized to find for the defendant in this case, whether John and Samuel Lowe ever had a deed to that land or not; that is, if he paid the purchase money and went into possession of it, and it was so recognized by W. H. Lowe, then that gives him a perfect title, and he would be entitled to this land, if you believe that. But, upon the other hand, while that trade may have been made between John and Hal, and Hal may have made the trade to give him his interest in it, yet if John didn't pay up the purchase money, and the trade was rescinded between him and Hal, and it was so considered between them, and he failed to pay the purchase money, then Hal's wife and children would be entitled to recover this land.

"If you find Hardison made Samuel and John Lowe a deed, and

by mistake left out the description of this lot of land, and if you find from the testimony (and you must look to the testimony and see whether it is so or not) that this lot was not put in that deed, and Hal went to Hardison and requested him to make that correction and Hardison did make it in his presence with his consent and knowledge, then he would be bound by that, and his wife and children cannot recover that land. But if, on the other hand, that correction was made, and Hal didn't consent to it and didn't know it, and it was not made in the presence of these witnesses to the deed, then of course that wouldn't bind Hal nor his wife nor his children.

"Now those are the only rules I think necessary to give you in this case. You see it depends altogether upon what you believe from the testimony what is the truth of it, what you believe, and whether John bought Hal's interest, and what he paid him for it, and whether he bought it and the trade was rescinded.

"Now if he bought it and paid for it, then it is John's land; if he bought it and didn't pay for it, then it is not his land, and this plaintiff would be entitled to recover. Now look to the testimony and see what is the truth, and from the witnesses in the case, from the plaintiff and defendant, and from the testimony and what was said between the parties, what admissions were made by either one of the parties, what Hal said about it and then what John said about it after the death of his brother, and the explanation he made, and all that sort of thing. And right here I will charge you that all the admissions he has made must be scanned by the jury with care, for the reason that, the memory of the witnesses is so apt to fail them, and that the witnesses are so apt to forget the exact admissions, that the jury must scan all admissions with care. For Hal's, scan them with care; for John's, scan them with care. Not that you are not to believe it, but look to all the circumstances the witnesses testified to, their relation with the case, and things of that sort; that is the rule; if the testimony is conflicting, you must reconcile it, because the law requires it, because the law presumes that every witness on the stand is speaking the truth, and says the jury must not impute perjury to any of the witnesses, but must harmonize what they say; the law presumes that each witness speaks the truth. But if you cannot do that, then you must look to the witnesses, those not interested in the case, and must look to their testimony, the manner in which they testify, the relation they have with the case,—these and all other circumstances concerning the facts in this case. You must give credit to those witnesses whom you think are best entitled to belief.

"After an honest investigation for the truth in this case, if you determine that John bought the place from Hal and that he paid him for it, then of course that will end the case, and you would be authorized to find for the defendant; but if you think he didn't make that trade, or, if he did, he didn't comply with the contract, then you

would be authorized to find for the plaintfff, and there would be another question in the case,—how much rent ought John pay the plaintiff for this land?—that is, if you find it belongs to Mrs. Brown and her children. I do not remember the amount they have sued for rent, but they are entitled to recover whatever may seem right to your satisfaction, as to what the place is worth beyond the said four years before bringing this suit.

"Well, they say they only claim rent from the time Hal died; if that is so, find out when he died, and find what the rent is worth from the time he died up to the present time. In this case, your verdict would be, 'We, the jury, find for the plaintiff the premises in dispute; so many dollars for rent.'

"I am requested to charge you about the change in that deed, which I will. I want to tell you, if Hal carried that deed to Hardison and requested him to make the alteration in it, then he is bound by it; and I charge you, in addition to that, that if he carried it to Hardison and requested him to make the addition, or if he knew it was made, and allowed the place to be mortgaged to raise money on it and he got the money that was raised, then he would still be bound by it, and of course the widow would be bound likewise. Now, if he knew that and he received that money, then he would be bound.

"Now, look at the testimony in the case. I won't undertake to sum it up, because it has been ably argued; everything has been argued, I think, by able counsel. Look at the tax-books and look to all of it, and see what the truth is."

Two of the other grounds of the motion were, that the verdict was contrary to law and evidence, and because of newly discovered testimony, "that W. H. Lowe did not have John F. Lowe to mortgage this land to raise $730 to pay him to be used in paying off a debt for said W. H. Lowe, held by Charlton D. Gammage against him, which debt arose out of an award by arbitrators between him and said Charlton D. Gammage."

HARDEMAN & DAVIS, for plaintiffs in error.

DUNCAN & MILLER, for defendants.

BLECKLEY, Chief Justice.

The action was by the heirs at law of W. H. Lowe, deceased, Mrs. Brown, formerly Mrs. Lowe, suing in her

own behalf and as next friend of her minor children. The defendants were the father and the brother of the deceased, together with their tenant, Matthews.

In the lifetime of the deceased, one Hardison owned certain lands, including the premises now in dispute. The deceased severally, or he and his father jointly, made a contract with Hardison for the purchase of some of these lands, and possibly of all, whether of the premises in dispute with the rest, is uncertain. In February, 1874, the deceased took from his brother a promissory note, due in the following December, which note expressed on its face that it was given for the payee's "interest in the Hardison lands." From that year forward the brother returned the premises in dispute for taxation as his own, and, so far as appears, the deceased did not return them at any time during this period, though he continued in life more than nine years. Moreover, the brother was in actual possession. Prior to 1876, Hardison executed no conveyance. In January of that year, he conveyed by deed directly to the father and the brother; but this deed, as then made, embraced only the other lands; it did not cover the premises in dispute. In September, 1877, Hardison conveyed the sepremises by deed to the deceased, and it was under this deed that the plaintiffs claimed title. No history of this deed—no explanation of how it came to be made, appears in the evidence. In or about January, 1883, a clause covering the premises in dispute was inserted in the deed from Hardison to the father and the brother, so as to make that deed purport to convey to them these premises as well as the other land. When this alteration was made, none of the witnesses to the deed were present. The deed had previously been recorded, and no corresponding alteration or insertion was made in the record. Whether the deceased procured Hardison thus to alter and enlarge the scope of the deed, was contested at the trial, but the overwhelming weight of the evidence was that he did. In March, 1883, the deceased made an entry in a book to the effect that he

had received from his brother $730.00. Before that time, one or two credits had been indorsed on his brother's note, but not enough by perhaps fifty per cent. to discharge the note, even treating the book entry as an additional credit. In or about December, 1883, the deceased surrendered the note to his brother, but whether because it had been paid in full, or upon some agreement between them to rescind, is one of the questions in controversy. Not long after this transaction, the deceased died, leaving his brother in possession of the premises.

The defence was rested, not alone upon the general issue, but upon equitable pleas also. The jury found for the defendants; and a motion for a new trial made by the plaintiffs was overruled.

1. Numerous points are made upon the charge of the court, none of which we think sustainable. If we fail to discuss them in detail, it is because we look at the charge as a whole, and so regarding it, we are free from doubt as to its substantial correctness. Standing alone, various expressions in it would be amenable to criticism. A charge, torn to pieces and scattered in disjointed fragments, may seem objectionable, although when put together and considered as a whole, it may be perfectly sound. The full charge being in the record, what it lacks when divided is supplied when the parts are all united. United they stand, divided they fall. The charge submits fairly to the jury three questions, to-wit: whether the land in dispute was paid for; whether the altered deed was altered by procurement or with consent of the plaintiff's husband; and whether the trade was ever rescinded. These three questions of fact exhaust the case.

2. The objection that there was no evidence of a joint purchase by the deceased and his father which included the premises in controversy, seems at first view well taken. But a study of the evidence with reference to its bearings and tendencies, has satisfied us that this fact might legitimately be drawn from it by way of deduction or inference.

It not unfrequently happens that the testimony proves more than any one witness knows, or than is known to all the witnesses taken together. This is so perhaps in every instance where the evidence, though sufficient, is only circumstantial. Where the evidence is all direct, the jury can be no wiser than the witnesses, but they have to be wiser in order to find the truth of any fact upon circumstantial evidence alone. Nor to justify a charge is it requisite that the evidence, whether direct or circumstantial, should be free from obscurity. To warrant the court in charging the jury on a given topic, such as whether certain land was included in a purchase by certain persons of other land, it is not necessary that the evidence should shine upon it with a clear light. It is enough if glimpses of it be afforded by the evidence. Truth is often dim, but is truth nevertheless. Frequently amongst the facts best proved is one which no witness has mentioned in his testimony, such fact being an inference from other facts.

3. The testimony which rendered it certain that the deceased had procured Hardison to amend his deed to the defendants by inserting therein the premises now in dispute, was that of Mr. Haygood, an attorney at law, who detailed a conversation which he had with the deceased and his brother, or rather, which they had with him, touching the matter. This testimony was objected to as disclosing knowledge acquired under the seal of professional confidence. We agree with the court below in thinking that Haygood was neither employed professionally, nor consulted with a view to employment. He was "raided," not retained. To exclude declarations as communications to counsel, or made with a view to employment, their root in the relation, or contemplated relation, of client and attorney must be manifest. They must be the offspring of the relation, present or prospective, not of taking or expecting to take the fruits of such a relation without forming it. To tax a lawyer's courtesy or liberality for advice or services is not to employ him. Generally, the test of

employment is the fee. Furthermore, what is known to both parties is not a confidential secret in a subsequent controversy between them. *Burnside vs. Terry*, 51 *Ga.* 186.

4. Amongst other pertinent evidence tending to account for the alteration in the deed, was the testimony of Mr. Miller, now of counsel for the defendants, and the legal adviser of one of them (the brother) when the making of such a change in the deed was first suggested. Indeed, if the scheme of bringing the premises under the operation of that deed did not originate with him, he at least counselled his client how it ought to be carried into effect. The conversation in which he did this, and at which the deceased was not present, was objected to as inadmissible. It is true that what a person and his legal adviser say to each other is usually not proper evidence to affect third persons, but here Miller's evidence includes conduct as well as declarations. He shows that a business transaction was in contemplation; that the deed was examined with reference to that; that this examination disclosed the absence of these premises from the terms of the instrument, and, thereupon, that he gave advice as to their insertion. This explains how the brother came to take an interest in having the alteration made, and it was after this that the two brothers were together in conversation on the subject with Haygood. The conversation with Miller was a prelude to the conversation with Haygood, tends to account for it, and is a link in the chain of explanation touching the main fact—that is, the alteration of the deed. The alteration certainly occurred, and it was of vital importance to show how and why it occurred. When a relevant fact or act is to be accounted for, a conversation had by one of the litigating parties with a third person in the absence of the other, may account for it or serve as a link in the chain of explanation. If so, it is admissible in evidence. But the application of this rule must be carefully guarded. We think the rule was properly applied in the

present case.    It may be that we are not accurate in treat-
ing Miller as retained counsel when he examined the deed
and gave advice respecting its alteration, but if so, it makes
no difference.    His testimony was equally relevant and
admissible, no matter in what character he was then acting.

5. Some other evidence was objected to, and some ille-
gal evidence was admitted over objection.    Of this all that
was the least material was withdrawn from the jury.    It is
complained that though ruled out, the court erred in not
instructing the jury in the general charge not to consider
or regard it.    Doubtless, the better practice is to give such
instructions, plainly and distinctly, at some timely stage
of the proceedings, and it seems that some authorities else-
where require it to be done.    Howes *vs.* Gustin, 2 Allen,
403; Smith *vs.* Whitman, 6 *Id.* 562; Goodnow *vs.* Hill,
125 Mass. 587.    But we believe an average jury in this
State would always understand that evidence, after being
ruled out or withdrawn, is no part of the case and ought
to have no influence on the finding.    There is no sugges-
tion in the record that the act of the court in withdrawing
this evidence was not open and public, distinct and un-
qualified, or that there was anything special to prevent the
jury from comprehending it.

There was no material evidence admitted illegally, ex-
cept that which was withdrawn from the jury before the
charge of the court was delivered, and the fact of with-
drawal plainly implying that it was not to be considered,
there was no error in omitting to warn the jury in the gen-
eral charge not to consider it.    In a civil case, if not in all
cases, the evil done by suffering the jury to hear illegal
evidence is sufficiently corrected, as a general rule, by
merely withdrawing the evidence or ruling it out.

6. The newly discovered evidence would not change the
verdict, and the verdict is already right.

Judgment affirmed.