### 30618. McGEE *v.* BENNETT.

DECIDED MARCH 14, 1945. REHEARING DENIED MARCH 29, 1945.

*Leonard Farkas, Walter H. Burt,* for plaintiff.

*J. N. Peacock,* for defendant.

MacINTYRE, J. 1. Special grounds 1, 2, and 3 of the motion for new trial are predicated upon the court's refusal to give in charge to the jury the Code, § 5-1502, which is as follows: "It shall be the duty of all manufacturers, jobbers, dealers, and agents in advance of offering calcium arsenate, lead arsenate, and dust mixtures containing sulphur, lead arsenate, and lime, and other insecticides and fungicides commonly used on cotton, field crops, and fruits, for sale, to brand on each package, containing the same, the words, 'calcium arsenate,' 'lead arsenate,' and 'dust mixtures containing sulphur, lead arsenate, and lime,' and the weight of the package in full, the name and address of the manufacturer, also the contents of goods, the guaranteed analysis, solubility, and density." The plaintiff contends that 2% ceresan and 5% ceresan,

known as "New Improved Ceresan," are fungicides that come within the provisions of § 5-1502, and that it was reversible error for the court to fail to charge this section upon request. In this statute general words follow specific words which specifically name certain enumerated objects which are required to be branded, etc. Thus, under the doctrine of ejusdem generis, the application of which we think would be an aid in ascertaining the legislative intent in this case, the general words should be construed to embrace only objects similar in nature to those objects specifically enumerated by name. The specific words which describe and enumerate the objects embraced in the statute, both preceding and following the general words "other fungicides" show that the legislature intended to embrace in the statute objects of the same class only, otherwise it would have used only the one compendious name "fungicides," commonly used on field crops. We find nothing in the evidence which shows that "2% ceresan, which contains 2% ethyl mercury chloride, and inert ingredients of 98%, nor the 5% ceresan, which contained 5% ethyl mercury chloride, were objects of the same nature as "calcium arsenate, lead arsenate, and dust mixtures containing sulphur, lead arsenate, and lime," which the statute specifically names as the objects required to be branded, etc., in the manner prescribed in the statute. We do not think the object or thing here in question comes within the provision of such statute, and the refusal of the court to charge this section on the ground that it was not applicable was not erroneous. 2 Sutherland on Statutory Construction (3d ed.), p. 401, § 4911.

2. In special ground 4, the movant contends that the judge, by a narrative reading to the jury of the allegations of the defendant's answer, and expressly stating to them that he was merely stating the contentions of the defendant as shown by his answer, erred in thus reading paragraphs 13, 14, and 18 of the answer, in that there was no evidence to sustain the allegations in these paragraphs. "While it is erroneous for the trial judge to submit to the jury an issue not arising under either the pleadings or the evidence, still it is not reversible error for the court, in stating the contentions of the parties, to state these contentions as they are presented in the pleadings, even though there be no evidence, or insufficient evidence, to support the contention. The well-recognized proposition that error can not be successfully assigned of

a refusal to direct a verdict is merely a corollary of this general proposition." *Matthews* v. *Seaboard Air-Line Railway,* 17 *Ga. App.* 664 (87 S. E. 1097). Thus there was no error, even if the contentions stated were not supported by any evidence. "It is one thing to state what a party contends and another, and a very different thing, to state the law applicable to such contention." *Atlanta, Knoxville &c. Ry. Co.* v. *Gardner,* 122 *Ga.* 82, 93 (8) (49 S. E. 818). See in this connection, *Hunt* v. *Pollard,* 55 *Ga. App.* 423, 432 (190 S. E. 71); *Gledhill* v. *Harvey,* 55 *Ga. App.* 322, 327 (190 S. E. 61); *A. G. Boone Company* v. *Owens,* 54 *Ga. App.* 379, 383 (6) (187 S. E. 899).

3. Special grounds 5 and 6. The court charged the jury in part as follows: ["Gentlemen of the jury, the defendant in this case, Mr. J. F. Bennett, contends that Mr. J. D. McGee came into his store and undertook to purchase, and did purchase from him, a quantity of ceresan; that he informed Mr. McGee that he had ceresan—'New Improved Ceresan'—and that Mr. McGee then said he would take it; that he did not make any misrepresentations to Mr. McGee as to what it was, but informed him at the time what it was, and Mr. McGee, knowing what it was, purchased it.] (Gentlemen of the jury, if Mr. McGee went into the store of Mr. Bennett and purchased the 'New Improved Ceresan' of 5% strength, knowing what it was, and undertook to get it, and called for it, and purchased it), and it damaged his seed peanuts in its use, he would not be authorized to recover in this case, for the simple reason, if you purchase an article that you call for and it is supplied to you, if you use it, if there is any mistake made in the use of it, it would be your mistake if you misused it; but if he went in there and undertook to purchase 2% ceresan and Mr. Bennett sold him the 5%, and stated at the time that the proper formula to use was three ounces to a hundred pounds of seed in the use of it, and Mr. McGee purchased this 'New Improved Ceresan' thinking that that was the proper strength to use it in the quantities told to him by Mr. Bennett, as he contends Mr. Bennett told him, and he used it and he was damaged by the use of it, he would be authorized to recover whatever reasonable damages he suffered by reason of having used it in the proportions instructed by Mr. Bennett." It is contended by the plaintiff that the part of the above stated charge enclosed in brackets was er-

roneous "for the reason that, as movant contends, the defendant did not say at any time that McGee, the plaintiff, said that he would take a different kind of ceresan than the 2%, nor did the defendant testify that he informed Mr. McGee at the time what it was, and thus the said charge [was] on a contention or theory unsupported by any evidence in the case." It is further contended that the part of the above charge inclosed in parentheses was erroneous for the reason that the defendant did not, at any time, say that the plaintiff called for "New Improved Ceresan" with 5% strength, and that this charge was unsupported by the evidence and was harmful to the plaintiff's rights in the case.

The plaintiff testified that he went into the defendant's store and asked for 2% ceresan and that the defendant gave him some 2% ceresan and some 5% ceresan, and the defendant testified in part that when the plaintiff came into his store "he said he wanted some ceresan and I told him that I had 'New Improved Ceresan' in bulk, and I called this boy, Otho Lee Mobley—he was the one who always dipped out the ceresan, for it was always a very offensive odor—and I told him to weigh me up 30 pounds of the red stuff—that's all he knew—he didn't know ceresan from fertilizer. . . The negro weighed up the ceresan . . I figured up what it cost and Mr. McGee gave me a check. . . When Mr. McGee first came to see me I looked to see if I had 2% in cans. I don't know whether Mr. McGee saw the pink ceresan being taken out of the drum or not, but I did tell him I didn't have enough 2% for his requirements and the only thing I had to make out his order was the 'New Improved Ceresan.' We were standing in a foot of one another when I said those three words." The defendant also testified: "We sold it right along—a hundred pounds every season—and sometimes we would run out and order again, and then carry it over—maybe we would sell ten or twelve pounds of it and then carry it over to the next season. Anyhow, after the 'New Improved [Ceresan]' came out I catered to it more than the other, and we have handled 'New Improved Ceresan' more than the others all put together. We sell it to anybody that calls for it, or if they called for ceresan, we would tell them, 'we have New Improved Ceresan,' or go show them what we had. I judge we have been selling the 'New Improved Ceresan' three or four years —as soon as it come on the market and we got the first folder we

started selling it." The defendant having testified that he offered "New Improved Ceresan" for sale to the plaintiff, wrapped it up, and then and there handed it to him, and that he then and there took it and paid for it without objection, it seems to us that this was equivalent to his saying, "I will take it." The parts of the charge inclosed in brackets and parentheses did not give the jury the benefit of any evidence not introduced, and the charge was not reversible error for the reason urged.

4. Grounds 7 and 8. The plaintiff objected to the introduction of a pamphlet issued by the manufacturers of the articles here sold, and an agricultural bulletin issued by the North Carolina State College of Agriculture in March, 1943, entitled, "Why and How To Treat Peanut Seed." The agricultural bulletin from the experimental station and the pamphlets of the manufacturer introduced by the defendant, in connection with the agricultural bulletins from experimental stations introduced by the plaintiff, showed that some of the writers of the articles in these pamphlets and bulletins stated that the use of these chemicals to treat peanut seed was effective, while the other writers stated that their use was detrimental and dangerous, and this, together with the other evidence, tended to show that the use of the chemicals here sold to treat peanut seed was in the experimental stage, and that the plaintiff was aware of that fact. We do not think that it was reversible error to allow these pamphlets and bulletins, as objected to in these assignments of error, to be introduced in evidence.

5. Special grounds 9, 10, 11, 12, 13, and 14 will be considered in this division of the opinion. The first five assign error on specific excerpts from the charge, and ground 14 contends that the court erred in charging such excerpts consecutively. This suit was brought on an implied contract. The judge charged the law of implied warranty with reference to the discovery of the defects, latent or patent, in an article sold by a particular description. *Americus Grocery Co.* v. *Brackett,* 119 *Ga.* 489 (46 S. E. 657). The judge gave in charge to the jury the following instructions, which, according to the plaintiff's brief, were given at the request of the defendant: "(a) I further charge you, gentlemen of the jury, that one of the contentions of the defendant is that the plaintiff had knowledge of the color of 2% ceresan, and if you find this to be true, and if you further find that the 5% variety was a differ-

ent color from the 2% variety, and if plaintiff knew this, and if you further find that plaintiff did not exercise ordinary care in discovering the fact that he had a different chemical from that he ordered, and that this lack of ordinary care caused the plaintiff's damages, if there were any damages to plaintiff, and if you find that the plaintiff's negligence, if any, was the sole cause of his damages, if any, then you should find for the defendant in this case.

"(b)  I further charge you, gentlemen, that if you find from the evidence in this case that the defendant was not negligent, and if you further find that the plaintiff was negligent in the handling of this product, you should find for the defendant.  That is, by reason of the fact that he failed to use ordinary care in discovering what he had.

"(c)  I further charge you that, if you find that the damage to plaintiff, if there was any damage, was caused by weather conditions, or the method of planting these peanuts, or because of the method of shelling the peanuts, or for any other reason over which this defendant had no control, you should find for the defendant in this case.

"(d)  I further charge you that if you find that the plaintiff in this case knew that he was buying 5% 'New Improved Ceresan' and that he was so told by defendant in this case at the time of the sale, then you should find for the defendant in this case.

"(e)  I further charge you that if you find that the defendant had no knowledge of the dangerous character of this product, if you find that it was dangerous, and in good faith sold the product to plaintiff, and plaintiff had full knowledge of what he was purchasing, then you should find for the defendant in this case.

"(f)  I further charge you that if plaintiff had knowledge that the manufacturer and the vendor sold this Ceresan of both kinds without any warranty of any kind and with notice to the consumer that there was no assumption of any liability for the use of the product, and that plaintiff had knowledge that the use of both products was in the experimental stage, then you should find for the defendant in this case.

"(g)  Gentlemen of the jury, you will decide the material issues involved in this case in favor of that party litigant with whom you find the preponderance of the evidence lies upon those material

issues." We have subdivided this part of the charge for reference hereafter as (a), (b), (c), (d), (e), (f), and (g). This requested charge seems to have reference to a situation where the plaintiff, having ordered one article of a particular description, yet another and a different article was delivered, and that notwithstanding the plaintiff's knowledge of this he proceeded to use the article as delivered and his negligent use of the article was the sole cause of the injury. There was no evidence that the chemicals sold by their trade name, the one 2% ceresan and the other 5% "New Improved Ceresan," were not of the description imported by their names nor properly compounded of the proper constituent elements which went to make each article described by its trade name. If the article delivered does not in fact answer the description of the one in the contract, it does not do so more or less, because the defect in it is patent, latent, or discoverable. Benjamin on Sales (7th ed.), p. 750. Yet, if the purchaser orders one article, and another and a different article from that ordered is delivered, and the purchaser knows this and accepts this article, and his negligent use of the article accepted is the sole cause of the injury in question, he can not recover. Jones v. George, 61 Texas 346 (3) (48 Am. R. 280). See in this connection, *King Hardware Co.* v. *Ennis,* 39 *Ga. App.* 355 (147 S. E. 119); *Segal* v. *Carroll Furniture Co.,* 51 *Ga. App.* 164 (179 S. E. 775); *Fleetwood* v. *Swift & Co.,* 27 *Ga. App.* 502 (108 S. E. 909); *Bel* v. *Adler,* 63 *Ga. App.* 473, 476 (11 S. E. 2d, 495); *Hawley Furnace Co.* v. *Van Winkle Gin Works,* 4 *Ga. App.* 85 (60 S. E. 1008); *Ayers* v. *John B. Daniel Co.,* 35 *Ga. App.* 511 (133 S. E. 878); *Buchanan* v. *Georgia Acceptance Co.,* 61 *Ga. App.* 476 (6 S. E. 2d, 162).

Division (a) of the above-quoted charge is not reversible error for the first reason assigned, i. e., that the suit is brought on an implied warranty and there were no latent defects and thus the case was not based upon negligence. It is true that the suit is brought on an implied warranty, but the defendant could defend for the reasons just above stated upon the negligent use of the article, if the misuse was the sole cause of the injury. Pendergrass v. Fairchild, 106 Oregon 537 (212 Pac. 963). Nor is division (a) of the charge reversible error for the second reason assigned, i. e., that there was no evidence in the case that the plaintiff had

knowledge of the color of the 2% ceresan and thus the fact of the 5% variety being of a different color, afforded him no opportunity of detecting the error. The defendant testified in part as follows: "Mr. McGee came in the place one Saturday afternoon, as I remember, and we had hundreds of customers, we were in a rush, but he came in and said he wanted some ceresan and I told him I had 'New Improved Ceresan' in bulk, and I called this negro, Otho Lee Mobley, he was the one who always dipped out the ceresan, for it has a very offensive odor—and I told him to weigh me up thirty pounds of the red stuff [which other evidence showed was 'New Improved Ceresan']—that's all he knew—he didn't know ceresan from fertilizer—but he was the only one that ever weighed up the ceresan—and when he came back I figured up what it cost and Mr. McGee gave me a check." The plaintiff testified that, at the time of the purchase, he heard the defendant tell the negro "to go get it [the red stuff];" that on the following Monday, under the plaintiff's direction and the direction of a Mr. Cox, they used the ceresan which he had purchased from the defendant. By using both the 2% ceresan and the 5% "New Improved Ceresan" it necessarily follows that the color of each would be observable, and that he used the same formula of 3 ounces per 100 pounds in applying both the 2% and the 5% ceresan to peanut seed. "Before I got the ceresan from Mr. Bennett, I received a bulletin dated January 23, 1941, and the last paragraph read: 'In several tests with 5% ethyl mercury phosphate, "New Improved Ceresan," severe injury to the seed was produced in every case.' I read that, but at that time I didn't know 'New Improved Ceresan;' I knew it as 5%. I read the bulletin, but it has always been fixed in my mind by the per cent. and not as the trade name. I did read the bulletin." On the Monday morning above stated, "I stopped at a store in Morgan, opened up the 5% ceresan sack, took out some of this pinkish-red ceresan and weighed out 3 ounces. I had this put in a separate package, and had me a little container made that would hold just 3 ounces [and used this container to measure out that amount to be used in each 100 pounds of peanuts]. . . After I purchased this 5% ceresan I had every opportunity to open it up and see that it was a pinkish-red, for it was in a plain paper sack, and I knew that when I used it on my peanuts that it was a pinkish-red ceresan. . . In 1936 and

1937 I used ceresan on my cotton. I am a director of the Georgia-Florida Association—Peanut Association—and I am familiar with the bulletin from the experiment stations about 2% ceresan —I read it. I hadn't used any kind of ceresan on peanuts before this year, but I had the knowledge of these bulletins as to 2% ceresan used on peanuts. It has been several years since I had used ceresan on cotton and I don't know what I used—both the 2% and the 5% are recommended by the Dupont folks for cotton—but I know now that I used the 2% by the color. It is not pinkish but grayish. . . I knew that I had been warned not to use the pink [ceresan]." In view of the fact that the plaintiff had formerly used 2% ceresan in 1936 and 1937; that he was a director of the Georgia-Florida Association of Peanut Growers; that while he had not used any sort of ceresan before this year (1943) on peanuts, he had used it on cotton; and that he had a knowledge of bulletins as to the 2% ceresan used on peanuts, it seems to us that since this evidence, as well as all the witnesses in the case who referred to the color of 2% ceresan, stated that it was grayish, the jury could have decided that the plaintiff knew that the 2% ceresan was gray in color. Thus there was no reversible error for the reason assigned.

Nor is division (a) of the charge quoted above reversible error for the third reason assigned, to wit: That "the same was an expression of an opinion by the court on the evidence, to wit: That if the 5% ceresan was a different color from the 2% ceresan, this was negligence on the part of the plaintiff, and, if it was the sole cause of his damages, he could not recover." This excerpt was not an expression of an opinion. It was a hypothetical statement that if certain facts were proved the jury should find for the defendant. *Donahoo v. Golden*, 61 *Ga. App.* 841, 845 (7 S. E. 2d, 820); *Thomas* v. *State*, 49 *Ga. App.* 484, 489 (176 S. E. 155); *Hunt* v. *State*, 81 *Ga.* 140 (2) (7 S. E. 142).

Division (b) of the above-quoted charge is not subject to the assignment of error, to wit: That "the same being based on a different theory of the case from that which was made, the action being laid for a breach of the implied warranty of the law and not being based on negligence," for the same reason given above that division (a) was not subject to a like objection.

Division (d) of the above-quoted charge is not subject to the following assignment of error, to wit: That "the defendant did

not tell the plaintiff, McGee, that he, the plaintiff, was buying 5% 'New Improved Ceresan,'" and thus the charge was based on a theory and contention not supported by the evidence. Under the evidence recited and the reasons stated in division 3 of this opinion, we do not think this ground is meritorious.

Division (e) of the above-quoted charge is not subject to the assignment of error for the reasons urged, i. e., that "the good faith of the defendant in selling the product to the plaintiff does not count in a suit based upon a breach of the implied warranty of the law, also there is no testimony or evidence that McGee had full knowledge of what he was purchasing, and thus it is a charge on a theory unsupported by the evidence." There is no merit to this assignment of error.

Division (f) of the above-quoted charge is not subject to the following assignment of error, to wit: There is no evidence that the plaintiff had knowledge that the manufacturers and vendor sold both kinds of ceresan without any warranty of any kind and without any notice to the consumer that there was no assumption of any liability for the use of the product and that the plaintiff had knowledge of both and that both products were in the experimental stage. The plaintiff testified: "Mr. Bennett did not tell me that I would get good results; he didn't guarantee anything. The discussion was about the proper proportion [to be used in applying the chemical]." The plaintiff also testified: "I am familiar with the bulletin from the experiment station about 2% ceresan—I read it. I hadn't used any kind of ceresan on peanuts before this year, but I had knowledge of the bulletins as to 2% ceresan used on peanuts. . . Oh, I got some of those bulletins but I don't remember the date; it was before I got the ceresan from Mr. Bennett. This bulletin is dated January 23d, 1941, and the last paragraph reads: 'In several tests with 5% ethyl mercury phosphate, "New Improved Ceresan," severe injury to the seed was produced in every case.' I read that but, at that time, I didn't know 'New Improved Ceresan'—I knew it as 5%. I read the bulletin but it has always been fixed in my mind by the per cent. and not as the trade name. I did read the bulletin. I think that 2% can looks about like the can that I used several years ago—I used it two or three years ago. I would say this provision was on the can: 'Recommendations of the Bayer-Semesan Company for the use of

this product are based upon tests believed to be reliable, but it does not guarantee the results obtainable, and offers this product for sale only on condition that the buyer assumes responsibility for any results, including injury or damage, following its use. The Bayer-Semesan Company guarantees only the standard quality of this product and adherence to its published formula, if any. Buyers not accepting the foregoing conditions are requested to return this package intact to the dealer from whom purchased, who is hereby authorized to refund the purchase price.' I don't remember reading it." It seems to us that there was sufficient evidence to support this part of the charge.

The plaintiff contends that in charging the jury consecutively in the language of the defendant's request, as above quoted, the court committed reversible error on the ground that such instructions, when put together, are argumentative and gave undue stress and emphasis to the defendant's contention without giving the converse of these excerpts. The judge can not crowd every legal principle into one paragraph. *Edwards* v. *A. B. & C. R. Co.,* 63 *Ga. App.* 212, 224 (10 S. E. 2d, 449). Previous to the instructions here complained of, he had instructed the jury at length as to when the plaintiff could recover, and, at the request of the defendant, in the excerpts complained of, he was charging the jury concretely on these defenses of the defendant. When we consider the charge as a whole, we think that the court had already hypothesized the facts which would have authorized the plaintiff's recovery, and this subsequent hypothesizing of the facts which would defeat the plaintiff's recovery does not show reversible error.

6. The evidence authorized the verdict.

*Judgment affirmed. Broyles, C. J., concurs. Gardner, J., concurs in the judgment.*

### ON MOTION FOR REHEARING.

MacIntyre, J. While it is true, as stated in the motion for rehearing, that the witness Higgins testified that the 2% ceresan and the 5% ceresan were fungicides, yet there is no evidence to show that they belong to the same class of fungicides or chemicals as "calcium arsenate," "lead arsenate," and "dust mixtures containing sulphur, lead arsenate, and lime." The act of the legislature in question, referring to the branding and to stating the contents on the packages containing insecticides and fungicides

used for field crops, was passed in 1920 (Ga. L. 1920, p. 209), and codified as § 5-1502 in the Code of 1933. Yet, the legislature, in 1923 (Ga. L. 1923, p. 103), passed another act providing that "all manufacturers of insecticides used for agricultural or horticultural purposes shall be required to have printed or have stamped on the containers of all insecticides the ingredients of the insecticide." We think that the passage of this latter act indicates that the legislature, by the act of 1920, did not intend to cover all insecticides and fungicides commonly used on field crops, for the later act of 1923, by the one compendious expression, "all insecticides," extended the provisions of the former act to cover other and all insecticides commonly used on field crops, but did not extend the provisions of the former act to "all fungicides," nor has it ever been extended, so far as we are aware, in regard to fungicides commonly used on field crops. This indicates that the legislature did not intend for the act of 1920 to cover *all* insecticides and fungicides. The fact of the passage of the last act, which is now for the first time mentioned, reinforces our construction expressed in the opinion that the chemicals of 2% ceresan and 5% ceresan are not embraced in the first act. See in this connection, *Botts* v. *Southeastern Pipe-Line Co.,* 190 *Ga.* 689 (10 S. E. 2d, 375); 2 Sutherland on Statutory Construction (3d ed.), p. 528, § 5110. This and all other matters in the motion having been considered, the rehearing is *denied. Broyles, C. J., and Gardner, J., concur.*