72921. ROBERT & COMPANY ASSOCIATES v. TIGNER et al.
(351 SE2d 82)

BIRDSONG, Presiding Judge.

Tort Liability. This multiple-day trial involves numerous parties and a voluminous record and transcript (over 3,500 pages). Considering those facts necessary to the disposition of the issues, we conclude the jury was warranted in believing the following. In approximately 1979, the City of Atlanta determined to expand the facilities at Hartsfield International Airport. In addition to the mid-terminal, the city leased certain property to the airlines for their personal and exclusive use as parking areas for airline employees. Eastern Airlines represented the airlines as the lessee-owner for the construction of the parking lots. Eastern entered into contract with a joint venture of design engineers Robert & Co. Assoc., Howard, Needles, Tammen and Bergendoff, Williams, Russell & Assoc. (hereinafter "Robert & Co."). Robert & Co. was charged with the responsibility to design the roadways, parking ramps for aircraft, landing strips, buildings, etc. The general contractor to construct the airport facilities in accordance with Robert & Co. designs was also a joint venture, Wright, Claussen, Matthews, MacDougald-Warren (hereinafter "Wright Claussen"). Wright Claussen subcontracted the roadway stripping and marking with Peek Pavement Marking, Inc. (hereinafter "Peek").

The locale giving rise to this litigation involves the roadway lead-

ing to the private parking lots designed by Robert & Co., constructed by Wright Claussen and painted by Peek. The roadway leading to the parking area was intended for the use of airline employees but was not closed to the general public. As originally designed and intended by Eastern, the roadway was a four-lane road with a median strip that was to go from adjacent highways leading to the airport past the parking areas but leading to and from the mid-terminal. It was intended that the southbound lanes would not only pass the parking areas but would proceed to a ramp leading to I-85 primarily for the benefit of the airline employees leaving the airline parking lots.

Ultimately, the Department of Transportation (DOT) declined permission to connect the southbound lanes to I-85. As a result the southbound lanes proceeded from an adjoining highway onto the airport property to a point adjacent to the airline parking area. Instead of proceeding further to the south, the two lanes merged into one and came to a deadend adjacent to the entrance to the Eastern parking lot. Robert & Co. designed the southbound lanes so as to force southbound traffic to move to the right lane and at the end of the southbound road make a 90 degree left turn. The design called for the word "STOP" to be painted on the surface of the roadway in letters eight feet high and seven feet nine inches wide. Immediately above the word "STOP" the design called for a stop bar. The purpose of the "STOP" and stop bar was to direct traffic proceeding south to come to the end of the southbound lanes, make a 90 degree turn and stop before entering the two northbound lanes going past the entrance to the Eastern parking lot and, further to the north, the entrance to the Delta parking lot and other airline parking lots.

The designs prepared by Robert & Co. clearly show the intent for the word "STOP" and stop bar to be painted at the intersection. For unknown reasons, even though the subcontractor Peek painted the hash marks on the left lane back toward the north from the intersection in the southbound lane, thus forcing the traffic to the right lane, it did not paint the word "STOP" nor the stop bar in the median at the intersection. After Peek had completed its work painting the roadway markings, it requested the general contractor Wright Claussen and the design engineer Robert & Co. (and the City of Atlanta) to make the final inspection and prepare the punch list preparatory to delivery and acceptance of the work by the employer, Eastern. In spite of the clear direction that the word "STOP" and stop bar be painted on the surface of the pavement at the intersection, neither Peek, Wright Claussen nor Robert & Co. noticed the deficiency of the word "STOP" or stop bar. Numerous witnesses testified that the most logical explanation was that the painting simply inadvertently was omitted and that omission never detected by the several parties including the owner Eastern. Also testimony was offered and unrebut-

ted that the intersection was designed in accordance with a technical manual recognized by all the parties as being expositive of the traffic safety requirements involving this and similar intersections. That manual suggested that for the intersection to be safe up to the standards of the manual, in addition to the word "STOP" and the stop bar there should have been a sign to the north of the intersection stating "STOP AHEAD" to alert the approaching motorists that there was indeed a stop. This was because a person coming to the intersection and making the 90 degree left turn would, upon approaching, see the word "STOP" and stop bar at an angle to the left until the turn was actually made to enter the parking lot across the northbound lanes or to make a U-turn to proceed back north in the northbound lanes.

In addition to the omission of the word "STOP" and the stop bar, the jury could have concluded that automobiles proceeding northward at a rate of speed of 40-50 mph would not be visible to a vehicle making the left turn from the southbound lanes across the northbound lanes into the parking lot. This was due to a curve in the northbound lanes to the south of the intersection and also to the wire mesh fences circumscribing the parking lots. The jury would also have been warranted in concluding that the design of the intersection was incomplete and unnecessarily dangerous because of the omission of the words "STOP AHEAD" or some stop sign in addition to the word "STOP" and stop bar painted on the pavement as well as because of the obscured vision caused by the fence and turn in the road.

The intersection and parking lot had been surrendered to Eastern and accepted by Eastern in 1980. The parking lot had been used daily during that two-year period. In early July 1982, James Tigner sought and obtained employment with Eastern airlines as a ramp employee. Tigner offered evidence that for approximately 30 years, he had been a musician, arranging, composing and playing with and for various groups throughout the country. During these years, he worked for various employers, all of which, he said, paid him in cash without the use of W-2 forms or regular salaries. As a result, Tigner could not and did not offer any testimony as to his wages or earnings during this 30-year period. He also candidly admitted that because he was paid in cash and had never had a W-2 pertaining to himself he had not filed income tax returns. Because he had been traveling as a musician so much during these years, he determined that he wanted to spend more quality time with his family; therefore, in 1982, he returned to Atlanta to take steady employment which he secured with Eastern. The evidence shows that he was to be a summer replacement for three months and he agreed in advance that he would be discharged at the end of the summer but with the possibility that he would be retained or rehired at the termination of the summer em-

ployment. His contracted wage was $358 per week, or approximately $15,000 per year. It is noted that throughout his musical travels his wife also worked and contributed towards the support of the family.

Tigner was scheduled to report for his first day of work with Eastern on the morning of July 9, 1982. He was given instructions to proceed from his home to Riverdale Road and enter the airport area on the two southbound lanes leading to the Eastern parking lot and to find a parking space in that lot. He would then be taken as all other employees were to the Eastern facilities by buses.

Tigner followed these directions and testified that he proceeded on a motorcycle south on the southbound two lanes. He noted the hash marks and obeyed them, driving to the right side until he came to the end of the road. He slowed, made the left turn, and inasmuch as there was no direction whether to stop or proceed, he proceeded directly across the two northbound lanes toward the guard shack at the entrance to the Eastern parking lot. He saw no oncoming traffic on the northbound lanes. In fact, there were two automobiles proceeding north on the northbound lanes approaching the intersection. The first automobile was operated by one Malone. There was a dispute as to his actual speed, there being estimates in the range from 25-50 mph. Malone testified that he never saw a motorcycle until after Tigner was on the hood of the automobile sliding up over the automobile windshield. The collision between Malone's automobile and the motorcycle caused Tigner to be thrown approximately 85 feet. There seems to be little dispute that he suffered serious fractures to his right hip, his right thigh and his left ankle. Two years after the accident (at the time of suit), Tigner still suffered constant pain and was required to walk with crutches. There was evidence which could establish to the jury's satisfaction that Tigner also suffered personality changes and loss of mental acuity. As a result of this accident, Tigner brought suit against the City of Atlanta as the owner of the property, contending that the City did not properly inspect the intersection for safety and allowed a nuisance to continue because of the dangerous situation inherent in the intersection. He contended that Robert & Co. was negligent in the design of the intersection and negligent in its final inspection by recommending that Eastern accept delivery of the parking lot and intersection even though the word "STOP" and the stop bar were not present. He contended that the contractor Wright Claussen was negligent in constructing an obviously dangerous intersection and in failing to insure that the subcontractor Peek carried out the instructions of the design engineer by omitting the stop bar and the word "STOP." He contended that Peek was negligent in failing to carry out the instructions of the design engineer and failing to paint the word "STOP" and the stop bar. He contended that Malone was the direct cause of the accident. Mrs.

Tigner joined the suit claiming loss of consortium.

Each of the corporate defendants filed cross-claims seeking contribution or indemnity should liability be established as to any one of the corporate defendants. After a ten-day trial, the jury returned a verdict of liability in favor of the Tigners and against Robert & Co. only. The jury returned specific findings in favor of each of the other defendants against Tigner and found against Robert & Co. on its cross-claims against the other defendants. During the trial, the defendant Malone settled with Tigner for $100,000 in exchange for covenants not to be pursued by Tigner and the other defendants. This $100,000 was deducted from the $2 million verdict entered by the jury against Robert & Co. Robert & Co. brings this appeal enumerating ten alleged errors by the trial court. *Held*:

1. Of the ten enumerations of error, six deal with the charge of the court. We commence our consideration of these enumerations by observing the trial court first charged the contentions of the several parties to the litigation. Thus, the court pointed out that as to the City of Atlanta it was contended by Tigner that the City permitted the continuing existence of a nuisance. It also was contended that its very design and lack of warning as to the dangerous invitation to proceed through the northbound lanes without stopping constituted the equivalent of a mantrap. The court also pointed out that Tigner complained the prime contractor Wright Claussen improperly built a dangerous intersection and negligently accepted the incomplete work of the subcontractor Peek. As to the appellant Robert & Co., the primary contention was that Robert & Co. improperly designed the intersection and negligently failed to inspect the completed work before recommending to the prime contractor and owner Eastern that the intersection be accepted as properly completed work. In short, the trial court delineated contentions of negligence which were applicable to six different defendants, some of which involve co-existent duties and some of which consisted of duties exclusively related to a particular defendant.

Appellant Robert & Co. now complains that the charge of the trial court authorized a verdict as to any one of the five corporate defendants based upon proof of negligent performance in any of the contended duties applicable to any of the defendants. Robert & Co. in effect asserts the charge outlining the various contentions allowed the jury to return a verdict against the design engineer based upon negligent performance of construction which applied only to the prime contractor; and likewise, would be to predicate negligence of Robert & Co. upon negligent acceptance of an incomplete contract when Robert & Co. could not accept the final completed work product, a responsibility of the owner, Eastern.

We reject this analysis advanced by Robert & Co. It is not error

for the trial court to state to the jury the contentions of the parties. See *McGee v. Bennett*, 72 Ga. App. 271 (33 SE2d 577). See also *Macon &c. R. Co. v. Musgrove*, 145 Ga. 647 (3) (89 SE 767). Viewing the charge of the court as a whole, it is clear that the trial court properly outlined the contentions of the parties to the jury and made clear that such were only contentions explaining in detail that Tigner had the burden of proof as to any such contentions based upon the evidence adduced at trial. A close examination of the charge of the court when applied to the evidence and arguments presented to the jury make it clear that Tigner primarily asserted as to Robert & Co. the asserted basis of Robert & Co.'s liability was its negligence in its designs of the intersection and its negligent inspection and recommendation to the owner that it accept the completed work when in fact the safety factors built into the intersection were omitted.

On review the charge must be considered as a whole and each part in connection with every other part of the charge. *Zayre of Ga. v. Ray*, 117 Ga. App. 396, 398 (5) (160 SE2d 648). A charge, torn to pieces and scattered in disjointed fragments may seem objectionable, although when put together and considered as a whole, it may be perfectly sound. The full charge being in the record, what it lacks when divided is supplied when the parts are all united. United they stand, divided they fall. *Brown v. Matthews*, 79 Ga. 1 (4 SE 13); *Bennett v. Haley*, 132 Ga. App. 512, 517 (5) (208 SE2d 302).

In addition to its contention that liability could be attached where no duty was owed (discussed above), Robert & Co. also asserts that the evidence did not establish a professional standard applicable to it as a design engineer against which the jury could measure negligence.

Even a cursory examination of the charge of the trial court reflects that the jury was charged on three separate occasions as to the appropriate standard to apply to Robert & Co. as a professional design engineer, the necessity of finding negligence under the facts and that the performance of its duty had to be measured against reasonable performance of similar duties by design engineers engaged in the performance of their duties. In each instance where the trial court referred the jury to the contention that Robert & Co. improperly designed the intersection or negligently inspected the intersection with a view to recommending acceptance by the owner, the jury was informed properly of the professional standard of care applicable to a design engineer. Moreover, there was convincing evidence by more than one traffic engineer, as well as by proof of the standard established by the accepted manual on safety features required at such an intersection, that the obscured vision and the absence of the word "STOP," the stop bar, and the warning sign, "STOP AHEAD," rendered this intersection unnecessarily dangerous. Lastly, we observe

that responsible employees admitted that the failure to detect the omission of the word "STOP" and the stop bar was the result of an oversight during the inspection, in spite of a duty to make a thorough inspection prior to making a recommendation to the owner to accept or reject the work product. If a defendant admits he failed to perform a duty he concedes he should have performed, and causation is shown from the failure, the case may become a "clear and palpable" case of negligence and proof of a professional standard is not required. *Hudgins v. Bacon*, 171 Ga. App. 856, 859 (321 SE2d 359). Therefore we find no merit in the contention by Robert & Co. that an improper standard was applied to it.

Robert & Co. contends that the charge of the court contained insufficient guidelines when charging on the negligent performance of its contract. The basis of this argument is that the jury was presented with a multiple page contract with many duties. Robert & Co. argues that the charge of the court would authorize a return of liability if the jury found negligent performance of any duty required by the contractor. Once again, we are satisfied the jury was aware that the only two bases upon which negligence could be attributed to Robert & Co. were the asserted negligent design and negligent inspection after the work called for by the design had been completed. We are satisfied, when the charge is considered in the light of the facts and argument, that it is unlikely the instructions when considered as a whole would mislead a jury of ordinary intelligence. *Thomas v. Barnett*, 107 Ga. App. 717 (5) (131 SE2d 818).

Robert & Co. contends the trial court erred by telling the jury that Tigner would be required to reimburse the United States (the Veterans Administration) in full for all medical and hospital expenses furnished to Tigner both before and after this litigation. The basis of this contention is that the Veterans Administration must apply the local law in determining the extent of its claim. Thus, if Tigner's compensation could be reduced under principles of comparative negligence, likewise the amount of the Veteran's Administration claim against Tigner would also be reduced to a like degree. Thus the charge to the jury that Tigner would be required to make full payment was allegedly an incorrect statement of law.

This contention certainly is ingenious and superficially appears to have much merit. Closer analysis reflects however that Tigner represented the United States in its claim in this litigation. Thus the jury's verdict would automatically reflect any reduction in the total claim awarded to Tigner which would reflect principles of comparative negligence. This automatically would reduce the amount of the claim owed to the Veteran's Administration. Medical expenses incurred by Tigner after the date of litigation as to amount is a matter between Tigner and the Veteran's Administration and not between

Robert & Co. and the Veteran's Administration. The trial court charged properly principles of comparative negligence and also properly charged that Tigner was required under appropriate federal law to reimburse the Veteran's Administration for medical expenses and care afforded him. There is no merit to this contention.

Robert & Co. also contends that the trial court erred in failing to charge that corporations are entitled to the same consideration which would be given to private individuals. The essence of this contention is that when comparing a seriously injured human (Tigner) against the financial resources and impersonal existence of a corporation, the jury would be inclined to give more consideration to the plaintiff Tigner than to the corporate defendants. While it is true the trial court did not charge in the language requested, we are satisfied the principle suggested by Robert & Co. was covered. The trial court gave a full, fair and complete charge specifically telling the jury they were not to base their decision upon sympathy for any party. This the trial court uttered on several occasions requiring the jury to weigh the evidence objectively. We also note that there were four corporate defendants, three of whom received favorable verdicts. It is not necessary to give the exact language of the request when the same principles are fairly given to the jury in the general charge. *Atlanta &c. R. Co. v. Armstrong,* 138 Ga. App. 577 (227 SE2d 71).

2. Robert & Co. asserts prejudicial error in the court's refusal to allow Robert & Co. to show Tigner had failed to file income tax returns for five years preceding the year of litigation. Robert & Co. wished to show this failure to file to the jury assertedly to impeach Tigner's evidence that he had successfully worked as a musician in support of his family for approximately 30 years. The trial court allowed evidence that Tigner could present no proof of tax returns but would not allow Robert & Co. to show the failure to file tax returns on the basis this would constitute evidence of a criminal act. It was shown that Tigner would invoke the Fifth Amendment if asked the question, and the trial court would not require Tigner to place such conduct before the jury. We conclude the trial court did not err in its ruling. While a jury might conclude from the failure to file a tax return that Tigner had not earned enough to support his family on his musician's income as he had testified (but in *no* dollar amount), it is equally true if not certain that the jury might conclude he was a tax evader. It is not error to refuse to open the evidentiary doors to such rank speculation. *Ellenberger v. Karr,* 179 Cal. Rptr. 583 (127 Cal. App. 3d Rpt. 423, 427 (2)) (1982). Particularly is this true where the prejudicial effect of the jury's speculation would greatly outweigh any benefit to the jury's understanding which conceivably might be generated by inferences derived from the evidence. See *Fred F. French Mgt. Co. v. Long,* 169 Ga. App. 702, 704 (2) (314 SE2d 666).

Even if we were to assume error in the court's ruling (which we do not), evidence of an impeaching nature as to Tigner's income for the 30 years prior to the accident was wholly irrelevant to the issue of damages. At no point did Tigner seek to establish the amount of his income prior to 1982. At best, the evidence that he failed to file tax returns would authorize Robert & Co. to show that Tigner earned less than $1,000 a year (the minimum figure requiring the filing of a tax return) and thus inferentially show that he was not as accomplished a musician as he sought to show. This same information could have been easily developed by Robert & Co. simply by asking the approximate figures that Tigner believed he earned in any given year. Such questions were never asked. In the absence of any representation that Tigner earned any particular amount of money during any given year, the only purpose of evidence that he failed to file an income tax return would be to make Tigner out as a criminal avoider of taxes. These acts have no relevancy as to any issue and do not constitute proper impeachment. We are satisfied the trial court properly excluded such testimony. We find no error in this enumeration.

In regard to the recoupment of lost wages, inasmuch as there was no credible evidence of ascertainable wages prior to the accident, the jury could assess no damages for the loss of non-existent wages. In fact as to past wages, the charge of the court limited the jury to a consideration of wages to be earned but were lost subsequent to the accident but prior to trial. The loss of future earnings was limited to wages that could be earned in the future, after the date of the trial. Thus, lost wages were limited to wages due on and after the date of the accident. The jury had before it evidence of a specific wage, i.e., $358 per week, plus evidence of expected continuance of life. It is not essential to the recovery of lost income benefits to show as a necessity a pattern of prior earnings, if the claimant can show that he has accepted and is engaged upon income-generating employment. *Leonard v. Preferred Risk Mut. Ins. Co.*, 247 Ga. 574, 575 (1) (277 SE2d 675); *Hartford Acc. &c. Group v. Adamson*, 176 Ga. App. 879, 881 (338 SE2d 867). Thus, the jury had positive evidence of earning ability of a specific amount at the time of the accident, evidence of a lifelong work habit, and nothing beyond speculation that Tigner would not retain the wage-earning capacity throughout the remainder of his productive life. The quantum of evidence sufficient to support a charge and resulting verdict for loss of wages need not be substantial or even direct. It is enough if there is slight evidence which may give rise to an inference from which lost wages as damages may be drawn and computed. *Douglas v. Rinker*, 134 Ga. App. 949, 951 (216 SE2d 629).

3. Robert & Co. also contends that the $2 million verdict is excessive as a matter of law and that the trial court erred in denying a motion for new trial based upon that ground.

Evidence was offered showing Tigner was permanently and seriously injured and disabled. The jury was warranted in concluding that he would never again be able to earn substantial income because of his disability, at least in the areas at which he had earned income in the past. He had incurred substantial medical expenses prior to the trial and the evidence was clear that even greater medical expenses would probably be incurred after the trial. There was evidence that he lost the ability to earn substantial wages both before and after the trial as a result of the accident. Evidence was submitted that Tigner had suffered personal humiliation and constant and significant pain for the two years from the time of the accident until the time of trial. Additionally as a part of the composite verdict, Mrs. Tigner was awarded consortium. We cannot conclude that the award of the jury in this case violates the standard established in *Redwing Carriers v. Knight*, 143 Ga. App. 668, 677 (239 SE2d 686), where this court stated: " 'Before the verdict will be set aside on the ground that it is excessive, where there is no direct proof of prejudice or bias, the amount thereof, when considered in connection with all the facts, must shock the moral sense, appear "exorbitant," "flagrantly outrageous," and "extravagant." "It must be monstrous indeed and such as all mankind must be ready to exclaim against at first blush." It must carry its death warrant upon its face'. . . . In view of the injuries suffered and damages proved we cannot declare that the verdict is excessive, particularly in view of the pain and suffering involved."

4. Lastly, Robert & Co. contends that if a new trial is granted, we must also grant a new trial as to all the co-defendants in relation to the cross-claims. Inasmuch as we find no error requiring a new trial in this case, this enumeration is moot and without merit.

*Judgment affirmed. Deen, P. J., McMurray, P. J., Sognier and Benham, JJ., concur. Carley, J., concurs in Division 3 and in judgment. Banke, C. J., Pope, and Beasley, JJ., concur in part and dissent in part.*

BANKE, Chief Judge, concurring in part and dissenting in part.

1. I do not believe the evidence relied on by Mr. Tigner to establish his claim for future lost earnings was sufficient to enable such damages to be calculated with reasonable certainty. Accordingly, I would hold that the trial court erred in submitting that claim to the jury and would remand the case for a new trial on the issue of damages. I agree with the majority, however, that no ground has been established for a new trial on the issue of liability. Similarly, I find no basis for granting the appellant a new trial on its cross-claims against the other defendants in the case.

The sum total of the evidence relied upon by Mr. Tigner to prove his lost future earnings consisted of (1) his testimony that he had

supported his family as a musician for the past 20 or 30 years, (2) the fact that he had secured temporary employment with Eastern Airlines the day prior to the accident for a period of 90 days at a wage of $358 per week, and (3) his testimony that he "felt like" he would be allowed to stay on with Eastern as a permanent employee at the end of the 90-day period — an expectation which was, however, exposed as ill-founded by his supervisor at Eastern, who testified that Mr. Tigner and the other temporary employees in the group with which he was hired were terminated as a group at the end of the 90-day period. Conspicuous by its absence was any attempt by Mr. Tigner to provide an estimate of his earnings during the years prior to the accident. His decision in this regard was, however, undoubtedly influenced by his evident failure to file any federal income tax returns for the years in question.

On the basis of the above evidence, Mr. Tigner's counsel argued to the jury as follows: "The Lord knows I am not trying to say Mr. Tigner was going to earn $358.00 for the rest of his life. As they pointed out, that was temporary employment, and whether or not he would stay with Eastern I don't know . . . All we know, he was the bread winner for his family for 20 some odd years. He supported his family, nobody else did. Jim Tigner did. Now he can't do it anymore. I'm simply suggesting at the minimum $358.00 a week is what he's worth."

Lost earnings cannot be recovered unless they are established with reasonable certainty. "The jury must be able to calculate the amount of the loss with such reasonable degree of certainty since, of course, the question of damages cannot be left to guesswork. [Cit.]" *Douglas v. Rinker*, 134 Ga. App. 949, 950 (216 SE2d 629) (1975). I do not find any evidence in the present case upon which anything other than a purely speculative estimate of Mr. Tigner's lost future earnings could be based. While it is true that one need not have worked on an everyday nor even a regular basis to establish a claim for lost future earnings, see *Michaels v. Kroger Co.*, 172 Ga. App. 280 (322 SE2d 903) (1984), some pattern of earnings must certainly be required. I do not believe that a lifetime of future lost earnings can reasonably be calculated on the *sole* basis of the salary a claimant was earning on the first day of the *only* steady job he had ever held in the past 20 to 30 years. The cases relied on by the majority, *Leonard v. Preferred Risk Mut. Ins. Co.*, 247 Ga. 574, 575 (1) (277 SE2d 675) (1981), and *Hartford Acc. &c. Group v. Adamson*, 176 Ga. App. 879, 881 (338 SE2d 867) (1985), do not support a different conclusion, as those cases do not refer to the quantum of proof necessary to authorize the recovery of lost future earnings in a personal injury action, but to the quantum of proof necessary to authorize the quite limited recovery of no-fault insurance benefits available to automobile accident victims as

compensation for *past* loss of income or earnings during due to disability. See OCGA § 33-34-4 (a) (2) (B).

2. In view of the foregoing, I would not reach the issue of whether the trial court was correct in denying the appellant the opportunity to cross-examine Mr. Tigner about his evident failure to file any federal income tax returns for the years immediately preceding the accident. While I am inclined to believe that this line of inquiry was made relevant by Mr. Tigner's insistence that he had always earned enough money to support his family, it would not be relevant in a retrial in which the issue of lost future earnings was no longer before the jury.

I am authorized to state that Judge Pope joins in this opinion and that Judge Beasley joins in Division 1 of this opinion.

DECIDED OCTOBER 14, 1986 —
REHEARING DENIED NOVEMBER 17, 1986 

*Kent T. Stair, Alan B. Kyman, Douglas A. Wilde*, for appellant.
*William C. Lanham, Clark H. McGehee, Gary L. Seacrest, Thomas S. Bentley, Edwin A. Tate II, A. Terry Sorrells, David D. Blum, Marva Jones Brooks*, for appellees.