Arnold J. FRANKEN, Appellant,

v.

CITY OF SIOUX CENTER,
Iowa, Appellee.

No. 2–61756.

Supreme Court of Iowa.

Dec. 20, 1978.

Rehearing Denied Feb. 15, 1979.

Daniel T. Cutler of Stewart, Hatfield, Klass & Whicher, Sioux City, for appellant.

Daryl L. Hecht of Crary, Huff, Yates & Clem, P. C., Sioux City, for appellee.

Considered by REES, P. J., and UHLEN-HOPP, HARRIS, McGIVERIN and LARSON, JJ.

LARSON, Justice.

Plaintiff appeals from an adverse judgment of the district court in a claim for personal injuries resulting from bite of a tiger owned by defendant city. We reverse and remand for new trial because of errors of the trial court in its instructions to the jury.

The issues presented for review are: (1) whether the trial court properly instructed the jury as to the defense of assumption of risk; (2) whether the court erred in refusing to grant plaintiff's "pet" instruction to the effect that persons in the vicinity of supposedly tamed animals are entitled to assume they will not revert to their original wild state; and (3) whether the court erred in refusing to submit the issue of future loss of earnings.

Most of the basic facts are not in dispute. Defendant city purchased a 300-pound Bengal tiger, named Stubby, from an owner in Minnesota. During the time the city was preparing permanent quarters for him, he was kept in a small warehouse owned by plaintiff. He was caged there in a steel cage, approximately five feet by six, and six feet high. Everett Franken, who was a brother of the plaintiff, and a city employee, was placed in charge of Stubby and the other animals purchased for the planned zoo.

There was evidence that while the tiger was in the warehouse several people petted him, including the mayor, city manager, Everett Franken, various children and other members of the general public. One person had lifted up his lip and touched a tooth. Plaintiff knew, at the time he was injured, of at least some of these incidents in which people had safely petted Stubby although he had actually seen only Everett pet him. He testified he saw no substantial risk in petting him.

When the tiger was first examined by Everett Franken on behalf of the city,

about one year before it was purchased, it was not fully grown and was not caged. He was caged, however, at the time Everett went to Minnesota to pick him up and was fully grown at that time. While in Minnesota, Everett saw the previous owner pet Stubby; he testified Stubby reacted like a house cat and responded to his name. From the date of Stubby's purchase until the time of injury, he was constantly caged by the city.

Stubby was fed by placing food on top of the cage and pushing it through with a stick. He was watered by pouring it through the cage openings into a trough. Plaintiff's brother, Everett, stated he did not open the gate to feed and water Stubby, preferring "to treat it as a dangerous animal" despite the fact he had petted him.

When Stubby was transferred from one cage to another, city employees put the cages door-to-door and chained them together so he could not separate them and escape.

There was evidence by a Des Moines zoo director that, at the time of plaintiff's injury, fecal accumulation and other conditions, including the small size of the cage and proximity to sheep in the same building, could cause the tiger to be "hyper" and aggravated. He testified such animals, when frightened, react instinctively by flight or attack, even if "affection trained."

On the day before his injury, plaintiff had placed some bedding in Stubby's cage by dropping wood shavings through the openings in the top of the cage. Stubby lunged, extended his paw through the opening and grabbed the shavings bag. On the night of the incident, plaintiff and four other men went to the warehouse. When they first arrived Stubby growled and began running around the cage, raising "quite a rumpus." There was evidence that Everett and another man advised plaintiff not to put his hand into the cage. He did, however, and the tiger grabbed it. Plaintiff sustained serious lacerations before the tiger's jaws were forced open with a steel bar and a board with a nail through it.

The law of Iowa, and that in most jurisdictions, imposes strict liability upon owners and harborers of wild animals. Restatement (Second) of Torts § 507(1) states the general rule as follows:

> A possessor of a wild animal is subject to liability to another for harm done by the animal to the other, his person, land or chattels, although the possessor has exercised the utmost care to confine the animal, or otherwise prevent it from doing harm.

A "wild animal" is defined in § 506, and there is no dispute here that Stubby qualifies for purposes of applying the Restatement rule of liability.

Comment (c) to the above section states that:

> One who keeps a wild animal is required to know the dangerous propensities normal to the class to which it belongs. It is therefore not necessary in order for the rule stated in this section to be applicable that its possessor should have reason to know that the particular animal possesses a dangerous propensity. He may reasonably believe that it has been so tamed as to have lost all of these propensities; nonetheless he takes the risk that at any moment the animal may revert to and exhibit them.

The possessor of a wild animal is subject to strict liability for harm caused by it even though it would not have happened but for the unexpectable innocent, negligent conduct of a third person, action of another animal or operation of a force of nature. Restatement (Second) of Torts § 510.

Such liability may therefore be incurred, even without any negligence on the part of the possessor. The Iowa law is in general accord with that of the Restatement. *See, e. g., Wenndt v. Latare,* 200 N.W.2d 862, 869 (Iowa 1972); *Terpstra v. Schinkel,* 235 Iowa 547, 553–4, 17 N.W.2d 106, 109–10 (1944); *Parsons v. Manser,* 119 Iowa 88, 93 N.W. 86 (1903). (While some of these cases state the standard is absolute liability, the principles stated are consistent with the Restatement's strict liability. *See, e. g.,*

*Terpstra,* 235 Iowa at 554, 17 N.W.2d at p. 110, where it states that "even where the owner or keeper of a wild animal is subjected to absolute liability, he may still defend on the ground that the injured party voluntarily exposed himself to injury.") Other than the label attached, there is no difference between the "absolute" liability of our cases and the "strict" liability of the Restatement, as applied to the present facts.

## I. The assumption of risk defense.

■■■■ Plaintiff pled his claim in the alternative, alleging negligence and strict liability in separate divisions. The defenses available to the city were different under each theory. Contributory negligence is a defense to a claim of negligence but not to a claim of strict liability. *Hawkeye Security Ins. Co. v. Ford Motor Co.,* 199 N.W.2d 373, 380–81 (Iowa 1972); Restatement (Second) of Torts § 515, Comment (b). Assumption of risk is a defense to a claim of strict liability, Restatement, *supra,* § 515(3), but is not available as a separate defense in a negligence case if contributory negligence is available. *Rosenau v. City of Estherville,* 199 N.W.2d 125, 133 (Iowa 1972). It was therefore critical for the trial court to make these matters clear to the jury in this case, in which both theories of recovery were submitted.

The trial court, in part following the Restatement principles stated above, instructed the jury regarding these divergent theories of recovery and the respective defenses available as to each, as follows:

In Instruction 1, the statement of the case, it correctly stated that plaintiff claimed damages under both negligence and strict liability. In the following instruction it stated defendant "alleges as an affirmative defense that any injury sustained by plaintiff was the result of contributory negligence on his part . . . and defendant further alleges that it is excused from any absolute liability in harboring the Bengal tiger by reason of the fact that plaintiff himself unreasonably and knowingly placed himself in a position of danger. . . ."

"Ordinary care" and "negligence" were defined as the care of an ordinary, careful and prudent person and the want of such care, respectively, in Instruction 5.

Instruction 8 stated the defense of contributory negligence, and applied it to defendant's theory of this case by stating defendant asserts contributory negligence of the plaintiff "in placing himself in close proximity to the cage" and placing his hand inside of it. The court listed the elements of the defense necessary to establish it here, i. e., negligence of plaintiff and proximate cause. It then stated "if the defendant has so proved both of the foregoing propositions, then the plaintiff is not entitled to recover and your verdict should be for the defendant." The court did not limit the application of this defense to plaintiff's negligence division. It did go on to state in this instruction that if defendant failed to prove contributory negligence, "then you may proceed to consider whether or not the plaintiff is entitled to recover against the defendant *in accordance with other instructions.*" (Emphasis added.) It did not clearly state in this instruction, nor in any other that the jury could consider the alternative claim under strict liability without regard to contributory negligence, although requested to do so by plaintiff's attorney. The trial court stated this was unnecessary since that was implicit in reading and comparing the different bases for liability as to each division.

Instruction 9 listed the elements for recovery under the negligence theory, and stated that if they were established, plaintiff should recover, unless defendant established the defense of contributory negligence, in which case "plaintiff cannot recover and your verdict will be for the defendant." The trial court failed to state plaintiff would in such event still not be precluded from recovery under his alternative strict liability theory. It would be particularly confusing to a lay jury in view of the fact that there was only one verdict form for plaintiff and one for defendant, and no special interrogatories were propounded to it. It was merely instructed that if it found contributory negligence

"your verdict will be for the defendant." Such likely confusion could have been avoided by a simple instruction, as requested by plaintiff, limiting the defense of contributory negligence or, of course, by submission of special interrogatories.

Instruction 11, as to which plaintiff raised his most strenuous objections, followed the Restatement, § 515, Comment (c), stating that:

Although one harmed by a wild animal is not barred from recovery because he has not exercised ordinary care, either to observe the presence of the animal or to escape from its attack, he is barred from recovery if he intentionally and unreasonably subjected himself to the risk of harm by the animal. Thus one who without any necessity for so doing that is commensurate with the risk involved *knowingly puts himself in reach of an animal that is effectively caged, cannot recover against the possessor or harborer of the animal.* (Emphasis added.)

Plaintiff objected to the quoted part of the instruction on the basis that it "applies to a wild or abnormally dangerous domestic animal that has escaped from control of its possessor . . . and therefore the statements in [it] have no bearing to the evidence introduced in this case."

■ Plaintiff contends on appeal that the emphasized portion was defective in that assumption of risk should correctly be applied only where plaintiff has acted knowing the risk involved—not knowingly doing an act, such as here placing himself in close proximity to the cage. This basis for plaintiff's objection to Instruction 11 was not, however, made to the trial court and may not be considered on appeal. Rule of Civil Procedure 196; *Froman v. Perrin,* 213 N.W.2d 684, 689–90 (Iowa 1973). We do give consideration to the emphasized portion of this instruction, however, only to determine whether the instructions, when taken as a whole, adequately informed the jury as to the nature and application of the defense of assumption of risk as requested by plaintiff. *See Robeson v. Dilts,* 170 N.W.2d 408, 414 (Iowa 1969).

Assumption of risk was not the subject of a separate instruction by the court, although plaintiff, in his requested "pet" instruction discussed later, did request such instruction be given, as follows:

The standards by which the plaintiff was required to conduct himself and which the defendant has the burden of proof to show is that the plaintiff had actual knowledge and full appreciation of the risk of harm from the tiger at the time he received his injuries.

The reason given by the trial court for refusal of that instruction was that "knowingly" was covered in the emphasized portion of Instruction 11. Knowingly placing oneself in a position where he may be harmed, however, without requiring a showing he "accepted certain inherent dangers with full realization of the hazards involved" would not sufficiently inform the jury on the matter of assumption of risk. *Froman v. Perrin, supra,* 213 N.W.2d at p. 689.

The defendant here also felt the matter was inadequately covered by the court's instruction defining assumption of risk, and requested an instruction defining it. It was refused, but of course, this is not assigned here as error by defendant, who was successful at trial.

■ Even though plaintiff's requested instruction may not be fully correct in all details, it did alert the trial court to the need to define assumption of risk, which was not otherwise done by it. Even a defective requested instruction is sufficient to preserve error if it alerted the trial court to the claimed error. *Froman v. Perrin, supra,* at pp. 689–90.

■ The need for specific instructions on assumption of risk is especially critical in this case, because of the separate theories of negligence and strict liability and the applicability of divergent defenses as to each. Without any specific guidance by the court as to what constituted the defense of assumption of risk and without any specific prohibition from doing so, it is very likely that a lay jury, in seeking to give meaning

to this theory, would improperly, but understandably, stray into the definition of contributory negligence, which has no application to the strict liability claim of plaintiff. This is particularly true when the instructions are considered as a whole, as the jury was instructed to do.

In addition to those parts of the instructions set out above, an additional statement was added to Instruction 11, as follows:

This kind of contributory negligence, which consists of voluntarily and unreasonably encountering a known danger is frequently called either contributory negligence or assumption of risk, or both.

There is no claim that this does not correctly state the law, and was in fact requested by the plaintiff, who claimed it clarified the preceding paragraph of Instruction 11 as to which the court had overruled his objections. The mischief in such statement, however, is not that it is an incorrect statement of law, but that it would tend, without limitation by the court, to merge the two defenses. If the trial court had clearly stated to the jury which defense applied to each theory of liability, and made it clear that this is not the conventional "contributory negligence" previously discussed by it, this confusion could be eliminated. What constitutes "unreasonable" here? Without directions it is very likely the jury looked to the definition of ordinary care in the following instruction. "Unreasonably" standing alone would appear to insert an element of objective, as opposed to subjective, evaluation as required by assumption of risk. *See Froman v. Perrin,* 213 N.W.2d 684, 689 (Iowa 1973). "Knowingly" is not defined as requested by the parties. This term, standing alone, could as claimed by plaintiff, convey the idea to the jury that knowingly *placing* oneself in proximity to the cage would amount to assumption of risk, whereas the proper application of the doctrine is placing oneself in a position knowing the risk. *Id.*

Without such distinctions being made clear, Instruction 8 would also be confusing in the jury's attempting to understand assumption of risk. That instruction stated that plaintiff's placing himself in close proximity to the cage was relied upon by defendant as one of the bases for contributory negligence. The jury was instructed to decide the issue of contributory negligence by comparing plaintiff's conduct to the acts of a reasonably prudent man under the circumstances. This is a correct application of the contributory negligence defense, but how was the jury to know the basis for application of the objective standard of ordinary care under the circumstances, applicable to Instruction 8, was different from the subjective measure of what plaintiff actually knew of the risk under the defense of assumption of risk unless the court pointed it out? This would be especially true here where both defenses are premised upon the same physical act of the plaintiff, i. e., placing himself in close proximity to the cage. *See King v. Barrett,* 185 N.W.2d 210, 213–14 (Iowa 1971).

The totality of the circumstances here, therefore, dictate that some guidance be given regarding this defense; that the court's one sentence reference to "knowingly" placing oneself in a position of danger did not adequately or correctly define its terms.

We hold it was reversible error to refuse an instruction on assumption of risk as requested. Because the matter will be remanded to the district court, other claimed errors should be dealt with for guidance upon any retrial of the case.

## II. Plaintiff's requested "pet" instruction.

Plaintiff on appeal complains of the failure of the trial court to give his requested "pet" instruction. This closely followed the wording of Restatement (Second) of Torts § 515, Comment (f), and would have told the jury, in part, that:

If you find . . . that the City of Sioux Center, acting through its agents, officers and employees, believed the tiger was thoroughly tame, the defendant . . . took the risk that the tiger might revert to its original wild habits and that such risk is that of the City and not the plaintiff in this case.

Those in whose vicinity the animal is kept are entitled to assume that the animal will not so revert if the possessor or harborer deals with it in such a way as to give them reason to believe that the defendant regards it as so tamed as to be no longer dangerous.

[As part of this instruction, plaintiff also requested that the court submit his definition of assumption of risk, as discussed above.]

An example given in the Restatement comment to illustrate this concept is an elephant offered by its owner for rides by children. If the elephant became suddenly savage, the owner would become liable, the parents being entitled to assume that the elephant is tamed as represented. Another example is a chimpanzee, made accessible to an audience, reverting to a savage state.

■ To warrant giving an instruction to the jury on an issue, there must be substantial support for it in the record, and a mere scintilla of evidence is not sufficient. *Walker v. Sedrel,* 260 Iowa 625, 632, 149 N.W.2d 874, 878 (1967). To determine sufficiency of the evidence, it must be given the most favorable construction it will bear in favor of the requesting party. *Miller v. International Harvester Co.,* 246 N.W.2d 298, 301 (Iowa 1976). When so viewed, we hold the evidence in this case did not warrant giving this instruction and the trial court properly refused it.

There is nothing in the record from which the jury could reasonably find that the City, through its employees, believed the tiger was "thoroughly tamed" or that they dealt with it "in such a way as to give them reason to believe that the defendant regards it as so tamed as to be no longer dangerous." The City's full-time caging of the animal, its careful method of transferring it from one cage to another, the method of feeding, watering and bedding of it, and the other facts outlined above clearly show that the City did not regard it as tame. Even though several persons had petted him through the cage and had not been injured, including city employees, this evidence falls far short of creating a sub-missible issue of its claimed "complete tameness" required to support plaintiff's theory.

## III. Loss of future earnings.

Plaintiff also contends the trial court erred in refusing to submit the issue of loss of future income. In his amended and substituted petition, he stated that as a result of his injury, "plaintiff has suffered great pain and fear, loss of earnings and medical expenses . . . ." Plaintiff testified he had difficulty using the tools of his electrical business; his doctor testified he was suffering a 15 to 20 percent disability of his body as a whole. Plaintiff proffered his own testimony of lost speed and efficiency and testimony of an economics professor upon the effect of the injury on his future earnings. These proffers were denied. The reasons given for exclusion by the court were that plaintiff had testified that he was back in full-time employment within a year of the injury, and further that no prayer for future loss of income was specifically made in his petition.

■ No specific demand was made for *future* loss of income, only a general demand for "loss of earnings." We have consistently recognized that claims for loss of past earnings and loss of future earning capacity (or "loss of future earnings") are separate and distinct elements of recovery and should be submitted as such to the jury. *See, e. g., Trushcheff v. Abell-Howe Co.,* 239 N.W.2d 116, 122 (Iowa 1976).

The issue though is whether the words "loss of earnings" are sufficient to submit loss of future earning capacity where, as here, there is evidence to support it, or whether the recovery must be limited to loss of past earnings.

■ We recognize that prudence, as well as prior procedural rules and cases indicate a better practice would be to state the bases separately, i. e., loss of earnings "past and future" (or perhaps more correctly loss of earnings and impairment of future earning capacity). The words used obviously do not include "future" but nei-

ther do they say "past." By the use of this phrase, plaintiff has in effect, advised the defendant that "my injury affects my ability to do my job." It is doubtful that a defendant's attorney could claim he has been surprised or misled by an attempt to submit loss of future earning capacity under that wording. That is especially so here, where plaintiff specifically alleged that his condition was "permanent" and discovery well in advance of trial indicated that this basis of recovery did in fact exist in this case.

Our court in a similar case involving failure of the plaintiff to allege future pain and suffering stated that: "We think plaintiff's pleadings and evidence were both sufficient to warrant recovery for future pain and suffering. An express allegation of future pain and suffering is not required where it is alleged the injury is permanent, it is such that future pain is reasonably certain to follow and there is a general allegation of damages." *Arenson v. Butterworth,* 243 Iowa 880, 890, 54 N.W.2d 557, 563 (1952).

Our rules have been recently liberalized as to pleading requirements in general. *See, e. g.,* Rule 67 which provides that the sufficiency of pleading shall be "construed and enforced to secure a just, speedy and inexpensive determination of all controversies on the merits" and Rule 69, providing for a "short and plain statement of the claim" showing entitlement to relief, and "judgment for the relief to which he deems himself entitled."

Also see Rule 95 which indicates a relaxation as to the details required in the prayer of the petition by prohibiting any orders requiring separate valuations of the individual elements of recovery.

We find under the facts of this case, and in light of the recent liberalization of our pleading practices, that the issue of loss of future earnings or loss of earning capacity should have been submitted under the petition as originally amended.

Here plaintiff requested leave to amend the prayer to conform to the proof and the trial court refused. Because we hold the issue of future loss of income should have been submitted under the pleadings as they existed, without amendment, it is unnecessary to determine whether the trial court abused its discretion in refusing leave to amend under Rule of Civil Procedure 88. This case is reversed and remanded for new trial in compliance with these holdings.

REVERSED AND REMANDED.