Scott CALDWELL, et al., Plaintiffs,

v.

OHIO POWER COMPANY, Defendant.

No. C84–3230A.

United States District Court,
N.D. Ohio, E.D.

March 23, 1989.

Patrick J. Hart, Scanlon & Gearinger Co., L.P.A., Akron, Ohio, for plaintiffs.

James R. Blake, Craig G. Pelini, Day, Ketterer, Raley, Wright & Rybolt, Canton, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge.

This matter is before the Court on defendant's motion, filed December 29, 1988, for a new trial and/or amendment of judgment. This is a negligence action brought under 28 U.S.C. § 1332 by virtue of diversity of citizenship. Plaintiff Scott Caldwell, who was eight years old at the time, suffered extensive burns and lost most of his right foot as the result of his coming in contact with a 7200–volt uninsulated sagging power line owned by defendant. (The claim of the other plaintiff, Scott's father, for the loss of his son's services and for medical expenses was filed beyond the period allowed by the applicable statute of

limitations and dismissed by this Court's order issued on March 26, 1987). For the reasons which follow, defendant's motion for new trial and/or amendment of judgment as to the verdict reached on Scott Caldwell's claim is denied.

## I *Introduction.*

On December 15, 1988, after a two-week trial, a jury returned a verdict in favor of plaintiff. Answering questions submitted in the form of a special verdict, the jury found that plaintiff had established defendant's negligence by a preponderance of the evidence, and that defendant's negligence proximately caused plaintiff's injuries. The jury also found that defendant should pay plaintiff $1,232,000 as compensation for bodily injuries, resulting pain, suffering, disability, disfigurement, mental anguish and loss of capacity for the enjoyment of life experienced in the past and reasonably certain to suffer in the future. The jury also found that plaintiff should recover $968,000 as compensation for impairment of future earning capacity. The total amount of plaintiff's verdict was $2,200,000. The jury found plaintiff not contributorily negligent.

Defendant, in its motion for new trial, does not argue that the Court's application of Ohio negligence law was incorrect. Instead, defendant's sole argument relates to the size of the verdict and the alleged influence of passion or prejudice on the jury's deliberations.

Defendant contends that the verdict was rendered under the influence of passion or prejudice and was not reasonably based on the evidence. Defendant argues that the jury merely adopted the calculation of future damages of Dr. Burke, an economist called by plaintiff, and that Dr. Burke's testimony was speculative. Defendant also suggests that the jury's decision was influenced by the admission into evidence of photographs showing plaintiff's injury, by the visible emotion displayed by plaintiff's mother during the trial, and by the time of year (shortly before Christmas). Defendant contends that the size of the verdict, in itself, demonstrates that the verdict was based on passion, prejudice and sympathy. Finally, defendant argues that the behavior of two jurors after the verdict supports defendant's conclusion that the jury's deliberations were tainted by passion or prejudice.

Defendant's contentions are without merit as will become readily apparent from the analysis to follow. Plaintiff established a strong evidentiary foundation for the establishment of a record supporting the jury's liability verdict and damage award. If defendant had left its easement cleared of landslide debris, the power line would not have fallen within a few feet of the ground in an area known by defendant power company to be frequented by many local residents. Mr. Ancell, plaintiff's vocational expert, indicated that but for Scott's injuries, Scott would have been ideally suited (based on Mr. Ancell's analysis of aptitude tests, Scott's high school performance, and Scott's expressed interest and familiarity with police work) for a career as a New York City policeman. Dr. Burke, plaintiff's economist, used the vocational expert's findings and plaintiff's assumptions based on the evidence, to arrive at a calculation of the present value of income Scott has lost due to his injuries.

Plaintiff's trial attorney, contrary to defendant's contention, maintained a professional, non-sensationalist profile through the trial and was not given to theatrics or antics which might have affected the jury's rational approach to the trial. The defense counsel was the one who suggested that insulating the power line on this much-frequented hillside would be "impractical" due to its "costliness" (and alleged unreliability). The defense counsel also called expert witnesses to testify concerning the cost of safety features which might have prevented the occurrence. Defendant's expert, Mr. Denbrock, told the jury that insulation would require "... extremely expensive facilities. You and I probably wouldn't be able to afford the cost of electricity if you tried to do that type of insulation overhead." This appeal to the jury's sensitivities was neither more nor less improper than any appeal made by plaintiff's counsel.

## II *Factual Background; Plaintiff's Injuries.*

Scott Caldwell was eight years old when he and his family came to rural Malvern, Ohio from their home in Staten Island, New York for an Easter Weekend visit. The morning after their arrival, April 19, 1979, plaintiff went exploring on the hillside behind his grandfather's home. The hillside was a popular site for a variety of recreational activities, such as hiking, hunting, and dirt-bike riding. Defendant's 7200–volt power line traversed the hillside. On that day, the line was sagging close to the ground. Several days previously, a local teenager shot the insulator which was supposed to hold the line to the crossarm of the pole. Because of the positioning of the poles and the eroding topography of the land, the line was about three feet from the ground when plaintiff came in contact with it.

During trial, plaintiff argued that defendant failed to properly locate, construct and maintain its electrical transmission lines and contended that the incident was foreseeable in light of defendant's knowledge that in 1977 a group of rock-throwing Boy Scouts knocked the same power line free of its insulator and crossarm. Plaintiff also introduced evidence of available safety measures (e.g. insulation, burying power lines, and "alley arms") which, if used, might have averted the incident. Finally, plaintiff introduced evidence supporting his argument that defendant had long known of the erosion on this hillside, the site of a former strip mine, yet defendant never cleared its right of way of debris to ensure that adequate clearance would remain in the event the power line became detached from a crossarm.

Plaintiff was eight years old when he was injured and seventeen at time of trial. His injuries were extensive, and have had a devastating effect on his appearance and physical capabilities. He underwent five surgeries in the eight weeks following the accident. He suffered serious electrical burns which required skin grafts. His right forefoot had to be amputated. He was fitted with a prosthesis as a child, but he suffers from constant pain in the stump which is growing worse as he becomes older and gains weight. Plaintiff's orthopedic physician, Dr. Chai Dharapak, explained that this is so because the part of the stump which bears his weight was not meant to be weight bearing. Dr. Dharapak testified that the pain and problems with the stump will be with plaintiff for the rest of his life.

The joint that connected the big toe on his other (left) foot had to be removed, necessitating a fusion locking the toe so that it cannot bend when he walks, which forces plaintiff to walk on the extreme lateral portion of his left foot. He also bears a disfiguring scar that extends from behind his right ear across his throat, just under the jawline. His entire right leg is extensively scarred. He has developed a painful lower back condition as a result of the way he has to walk. A leg length discrepancy makes his limp even more pronounced. His physicians testified that unnatural stresses have caused a disc compression in his lower back, resulting pain, and scoliosis, a permanent spinal deformity.

Plaintiff introduced evidence to support his argument that there are considerably fewer jobs available to him today because of his physical disabilities than would have been available to him if he had not been injured. Plaintiff testified that he intends to apply for college. Robert Ancell, plaintiff's vocational expert, testified that plaintiff's high school performance (he ranked in the lowest 25th percentile in his class) combined with his poor performance in the standard Regency tests in New York, point to a poor prognosis for plaintiff's success in college, if he is accepted.

## III *The Damages Award, Including the Economic Projection of Lost Future Income, was Reasonable Under the Facts of the Case.*

 Although defendant claims the entire verdict was rendered "under the influence of passion or prejudice and was not reasonably based upon the evidence," defendant's memorandum in support of the

motion specifically focuses on the $968,000 award for future lost wages.

At trial, Professor Burke testified that Scott Caldwell had a remaining life expectancy, according to the U.S. Life Table, of fifty-four and a half years. Professor Burke was asked to assume that Scott would have been employed as a New York City policeman if he had not been injured and then to compare what he would probably have earned as a policeman with what the average person with one to three years of college education would likely earn over the period of his remaining work-life expectancy. Professor Burke calculated that on the basis of these assumptions, plaintiff would lose future earnings with a present value between $923,000.00, (assuming plaintiff works until age 57, his worklife expectancy) and $1,044,000.00, (assuming plaintiff works until age 65). The projections took automatic pay increases, fringe benefits ("worth approximately 40 percent of your basic wage,") according to Dr. Burke, and longevity bonuses into account.

Defendant filed a motion in limine to preclude the testimony of Dr. Burke, relying on *Drayton v. Jiffee Chemical Corporation*, 591 F.2d 352 (6th Cir.1978). In *Drayton*, the Sixth Circuit stated that if "no reasonable person would, in the ordinary affairs of life, act upon the astronomical projections and assumptions made by plaintiffs' expert and accepted by the district court" the award for impairment of future earning capacity would be clearly erroneous. 591 F.2d at 364. In *Drayton*, the court held that Professor Burke's testimony should not have been admitted, since it was based on highly uncertain assumptions unsupported by the evidence.

*Drayton* involved an entirely different set of facts than we find in the instant case. In *Drayton*, the plaintiff was a black female, seven years old at time of trial, who was severely burned on her face by a drain cleaner when she was one year old. She was not otherwise disabled, either physically or mentally. Professor Burke was asked to project a loss of income for a seven year old black female on the basis of existing income standards for male college graduates, twenty-five years of age and over. Professor Burke was also asked to assume that the plaintiff's facial disfigurement would make her totally unemployable, even though there was no evidence of any functional anatomical impairment. 591 F.2d at 362.

The evidence in the instant case, unlike in *Drayton*, supported the assumptions Professor Burke was asked to make. Several factors lend reliability and credibility to Professor Burke's testimony. The absence of these very same factors was central to the court's conclusion in *Drayton*, 591 F.2d at 362, that Dr. Burke's projections in that case, were unreasonable. First, unlike *Drayton*, Scott's injury was very much a functional, anatomical impairment. Second, unlike *Drayton*, Scott was seventeen years old at time of trial, not seven, and he was nearing the point when he would have to make important decisions about his future. Third, again unlike *Drayton*, a vocational expert testified based on objective tests and processes which allowed him to assess Scott's vocational interests and aptitudes with a reasonable degree of certainty.

Defendant contends that there was no basis for the assumption that Scott would have been a New York City policeman but for his injury. To the contrary, there was considerable support for the assumption. The interest and aptitude tests administered by Mr. Ancell indicated that police work was a vocation for which Scott would have been most ideally suited and a profession for which he had a primary interest. Scott's father is a captain on the New York police force and a senior officer in the union. It would be natural for his son to want to follow in his father's footsteps. It would also be natural to expect that Scott might have an advantage in applying for a position as a family member. Finally, Scott indicated several times that he would like to have been a policeman.

Defendant, given ample opportunity to cross-examine Dr. Burke and Mr. Ancell, vigorously sought to minimize the weight and credibility of their testimony. Cross-examination, however, did not prevent the

jury from considering projections which "reasonable persons would, in the ordinary affairs of life," reasonably rely upon.

Defendant contends that on cross-examination, Dr. Burke "admitted that a more accepted practice of calculating economic loss under these circumstances was to assume that plaintiff's education level would be the same both before and after the accident level and then apply a 'disability factor' to calculate lost earnings." Dr. Burke never made such an "admission." Under this alternative approach, Dr. Burke testified that the present value of any wage loss would have been only $268,000. This alternative approach proposed by defendant was very different than the comparison Dr. Burke was asked to make for plaintiff.

Defendant also contends that the amount awarded by the jury for lost future earnings is outrageous because if invested at 10 per cent, the annual earnings would exceed a New York City policeman's salary. This argument ignores the foundation of Dr. Burke's testimony and calculations. Dr. Burke took into account the fact that the wage of a policeman will increase over time. The amount projected is the amount it would presently take to make up the difference in wage impairment over a 40 year worklife.

IV *The Damages Award was not the Result of Passion or Prejudice of the Jury.*

The size of the award, in and of itself, is not sufficient to establish excess damages and/or passion or prejudice of the jury. *Urseth v. Dayton*, 680 F.Supp. 1150, 1154 (S.D.Ohio, (1987); *Larrissey v. Norwalk Truck Lines*, 155 Ohio St. 207, 222, 98 N.E.2d 419 (1951). Defendant suggests, however, that not only the size of the verdict, but other factors as well, indicate that the jury's decision was motivated by passion or prejudice.

First, defendant suggests that the jury was in a festive mood due to the time of the year and did not take its responsibilities seriously. Defendant rests its argument on the fact that the jury took only two hours to reach its verdict, on the Jury Foreman's comment after reading the verdict, wishing all parties "Merry Christmas and Happy New Year," and on the fact that juror Ida Prokop hugged the plaintiff's mother after the verdict was read. In reality, the jury took its responsibility very seriously. After the verdict was read the Court thanked the jury for its service "... particularly at a time when it becomes very difficult, as we get close to the holiday season ... I want to thank you and wish you all a very happy holiday and hope to see you again someday." At this point, Mr. Roy King, the Jury Foreman, rose and addressed the Court:

> May I say something, Your Honor, Judge Lambros, Mr. Blake, Mr. Powell, Mr. Pelini, Mr. Caldwell, Scott, Mr. Hart, and the other members of your panel, we would like to thank you for the opportunity that you have allowed us to come here and participate in our system. It is like you said before, the best system that we can come up with, and it is not foolproof, but it is the best we know of, and it is the only way to resolve the problems, and irregardless [sic] of the decision that we have made, we would like to wish all of you a Merry Christmas and a happy New Year.

The Court does not believe that the system which Mr. King referred to can be isolated from the seasons. Neither Mr. King's words nor juror Prokop's embrace of plaintiff's mother *after the verdict was read* could have been understood as an indication that the verdict reached was based on passion or prejudice.

Next, defendant contends that "the emotional display of the plaintiff's mother" had an "improper emotional and passionate effect on the jurors." The Court allowed Mrs. Caldwell to sit at counsel table to assist counsel and her minor son through the two-week trial. At no time during the trial did defendant object, remark or discuss with the Court any objection to the mother's "conduct." Furthermore, she showed no undue emotion when she was asked to identify the photographs of her son's injury taken at Akron Children's Hos-

pital. She merely paused to collect herself. There were only brief moments when she became emotional, and they occurred during her testimony. Her testimony lasted approximately an hour and a half. She cried when she was asked to recall the event itself and the days immediately following Scott's injury. The involuntary manifestation of seemingly genuine emotion is not unusual in trials of this type, and does not call for a new trial. *See* Annot., 69 A.L.R.2d 954 (1960).

Finally, defendant objects to the introduction of the seven photographs of Scott's injury taken at Akron Children's Hospital and to Scott's showing the jury his prosthetic device and amputation. Defendant contends that the probative value of showing the photographs was outweighed by the risk of prejudice to defendant, therefore they should have been excluded, Fed. R.Evid. 403. The photographs were taken by an impartial physician for purposes of objective documentation of the injury and Scott's progress toward recovery, and they were presented at trial in an objective, non-sensational way. Although acknowledging that the photographs were a fair and accurate portrayals of plaintiff's injuries, defendant contends that the color photographs of plaintiff's burned foot were "extremely graphic and gruesome." The injury was severe, however, and this was a personal injury case. The photographs of the injury had substantial probative value of the fact and extent of the injury, as well as of the pain and suffering plaintiff endured. The photographs were instructive to the jury, and any prejudice to defendant was substantially outweighed by the photographs' probative value. *See Dabney v. Montgomery Ward & Co., Inc.*, 761 F.2d 494, 500–501 (8th Cir.1985), *cert. denied*, 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985) (in personal injury suit for injuries received in fire allegedly caused by defective furnace, photographs of injury admitted to show extent of injuries).

The Court also disagrees with defendant's argument that plaintiff should not have been allowed to remove his prosthetic device and show the jury his amputation. Again, the extent of the injury and its consequences were central issues for the jury to consider. Therefore, the probative value of the demonstration substantially exceeded any prejudice to defendant.

The jury was instructed to leave sympathy and emotion behind when it entered the jury room for deliberations. There is a presumption that the jury followed the Court's instructions. A jury verdict is presumed to be based upon the evidence presented at trial and to be uninfluenced by passion or prejudice. *Prudential Insurance Company v. Hashman*, 7 Ohio App. 3d 55, 454 N.E.2d 149 (1982). Defendant has not rebutted this presumption.

## V *Remittitur is Denied.*

"The proper role of the trial and appellate courts in a federal system in reviewing the size of a jury verdict is, ... a matter of federal law ..." *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 649, 97 S.Ct. 835, 837, 51 L.Ed.2d 112 (1977), (*citing Hanna v. Plumer*, 380 U.S. 460, 466–469, 85 S.Ct. 1136, 1141–43, 14 L.Ed.2d 8 (1965)). If the verdict was excessive, but not the result of passion or prejudice (which would have affected the decision of the jury on liability, as well as on damages), a remittitur would be a reasonable alternative to a new trial. *Urseth v. City of Dayton*, 680 F.Supp. 1150, 1152–53 (S.D.Ohio 1987), *citing* 11 C. Wright & A. Miller, Federal Practice and Procedure, section 2815 at 103 (1973) and C. McCormick, Handbook on the Law of Damages, section 19, at 80–81 (1935).

In *Neyer v. United States*, 845 F.2d 641 (6th Cir.1988) the Sixth Circuit upheld an award of $1.5 million: $1 million for pain and suffering, $250,000 for physical and mental disability and future treatment, and $250,000 for loss of consortium where an aircraft flown by FBI agents crashed into a woman's car. Her injuries included severe burns which required skin grafts, a 20% permanent functional disability in her hands and post-traumatic stress disorder (there apparently was no claim for future lost wages). The court commented:

Normally, when elements of damages for personal injuries cannot be precisely cal-

culated, the exact amount of a damages award is left to the discretion of the trier of fact within the framework of allowable elements under the law. 845 F.2d at 644.

■ A jury's determination of damages should not be reduced unless the award is "shocking" or manifests "plain injustice," or is "so grossly excessive as to be clearly erroneous." *Id., citing Petition of United States Steel Corp.*, 436 F.2d 1256, 1268 (6th Cir.1970), *cert. denied,* 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971). "Plain injustice" would result if a plaintiff could recover a damages award which was not supported by the evidence presented during trial. *See also In re Lewis,* 845 F.2d 624, 635 (6th Cir.1988) ("A motion for remittitur should only be granted if the award clearly exceeds 'the amount which, under the evidence in the case, was the maximum that the jury reasonably could find to be compensatory' for the plaintiff's loss. [*citations omitted*]," (emphasis in original).

A plaintiff is entitled to "just compensation based upon proof establishing … injuries and compensation with reasonable certainty," *Urseth,* 680 F.Supp. 1150. The court, in *Urseth,* citing *Drayton,* held that the standard for determining the excessiveness of a verdict is the amount which under the facts of the case, was the maximum that the jury could find to be compensation for the loss. *Urseth* was a wrongful death action in which the court reduced the award because it concluded that the jury's award of $2.75 million for loss of society and companionship was not supported by the evidence.

■ Defendant contends that a reduction in the verdict is mandated since the $2.2 million verdict exceeded the amount the jury could reasonably find necessary to compensate Scott Caldwell. In light of the facts of this case, the broad degree of deference given a jury's decision under the Seventh Amendment, and the results in similar cases, the Court cannot find the jury's verdict excessive.

Plaintiff argues that the award of $2.2 million is not excessive because of the na-

ture and extent of the injuries suffered. Scott Caldwell lost all of his right foot, except for his heel (a stump covered by a flap of skin), he lost motion and use of his left great toe, and he sustained disfiguring scars behind his ear along his neck and over his entire right leg. Scott also suffers from spinal disc compression and resultant permanent back pain, and scoliosis. The pain and suffering he has endured in the past including five surgeries, debriding treatment (the painful surgical excision of dead tissue necessary after skin has been seriously burned) and problems in the use of his prosthetic device. He has also suffered and will suffer from pain in the stump, atrophy of leg muscles, pain in the use of his right leg, disc compression and resulting permanent lower back pain. Evidence from a vocational expert and economist also provided a reasonable basis for the jury's conclusion that plaintiff will suffer from a disability and lost wages in the future.

Although the Court might have evaluated the evidence differently, I have to restrain any sense of disagreement if the Seventh Amendment is to be given its full effect. Other courts have reached the same conclusion in similar cases. In *Kelly v. Illinois Central Gulf Railroad Company,* 552 F.Supp. 399, 402 (W.D.Mo.1982) the court denied defendant's motion for remittitur. In *Kelly* a railroad conductor in his mid-thirties who lost the lower part of a leg in a railroad yard accident obtained a verdict of $1.25 million, $676,970 of which was for future economic loss reduced to present value as calculated by an economist who testified at the trial. Judge Sachs was on point when he observed:

A personal injury verdict which one judge may consider to be two or three times too high, or two or three times too low, can rarely be classified in such extravagant terms as "a clear miscarriage of justice" or "shocking" to the conscience. The subject defies reliable approximations in valuation when the divergent views of jurors must be duly honored [footnote omitted]. In other words,

the concept of reasonableness covers a very broad spectrum indeed.

552 F.Supp. at 402. *See also Chabot v. U-haul Co. of Kansas City Mo.*, 120 A.D.2d 301, 508 N.Y.S.2d 683 (1986), *appeal denied*, 69 N.Y.2d 612, 517 N.Y.S.2d 1027, 511 N.E.2d 86 (1987) ($1.8 million award upheld as not excessive when award was for injuries caused when trailer crushed plaintiff's knee, requiring amputation of leg, for past and future lost wages as hair stylist for 22 estimated remaining working years, for future expenses needed to procure services for living comfortable existence, and for damage to hobbies of swimming, fishing, hunting, hiking and woodworking) and *Robert & Co. Associates v. Tigner*, 351 S.E.2d 82 (Ga.App.1986) *cert. granted*, 354 S.E.2d 158 (Ga.1987) (Award of $2 million to motorcyclist who suffered serious fractures to hip, thigh and ankle due to collision, and still suffered pain and was unable to walk without crutches two years after the accident was upheld).

Finally, the Court notes that the result in this case was remarkably consistent with the verdict reached in a summary jury trial conducted on November 24, 1987. The summary jury trial (SJT) was conducted as part of the routine pre-trial processing of the case, *see Cincinnati Gas and Electric Co. v. General Electric Co.*, 854 F.2d 900 (6th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989); *McKay v. Ashland Oil, Inc.*, 120 F.R.D. 43 (E.D.Ky.1988). The jury reached an advisory, non-binding verdict in favor of plaintiff in the amount of $2.5 million. The jury instructions used during the SJT were substantially the same as those used during the trial. The SJT was not conducted during the holidays. Also, neither plaintiff's mother nor an economist testified. This would seem to support the Court's finding, based on the evidence presented at trial, that the verdict was not influenced by passion or prejudice. The Court is not inclined to conclude that two separate panels evaluating the same case would return verdicts based on passion or prejudice.

This case was ably tried by good lawyers on both sides. Plaintiff's counsel did not seek to elicit any emotion. The case spoke for itself. The Court allowed counsel for both sides the appropriate lattitude in presenting relevant evidence to the jury. Having observed the conduct of the attornies, the Court finds that no improper appeal to passion occurred. Even if the result may seem generous, the Court is unable to conclude that the verdict was "shocking" or that it was unreasonable in light of the weight of the evidence presented at trial. Accordingly, defendant's motion for new trial and/or amendment of judgment is denied.

IT IS SO ORDERED.